[No. 28162. *En Banc.* November 14, 1941.]

S AND W FINE FOODS, INC., *Respondent*, v. RETAIL DELIVERY DRIVERS AND SALESMEN'S UNION, LOCAL No. 353, *et al., Appellants.*[1]

[1]Reported in 118 P. (2d) 962.

*Vanderveer, Bassett & Geisness,* for appellants.

*Bogle, Bogle & Gates* and *Ray Dumett,* for respondent.

BEALS, J.—Plaintiff, S and W Fine Foods, Inc., is a California corporation, doing business in the state of Washington as a wholesale dealer in dried fruits, coffee, and canned goods. Plaintiff maintains an office and warehouse in the city of Seattle, employing in connection with that office nine salesmen, four warehousemen, a window decorator, and an office staff. The salesmen cover their territory by automobile, taking orders which are later filled from the warehouse.

The warehousemen are members of Warehousemen's Local Union No. 117, that union having no dispute with the plaintiff. None of plaintiff's salesmen was a member of Retail Delivery Drivers and Salesmen's Union, Local No. 353 (hereinafter referred to as the union), which desired to unionize plaintiff's establishment. The union sought a contract with plaintiff, whereby plaintiff would agree to hire only union men. Plaintiff refused to sign such a contract, and its nine salesmen unanimously refused to join the union.

Thereafter, during the month of April, 1940, plaintiff's warehouse was picketed by the union, the pickets

carrying signs stating that plaintiff was unfair to organized labor. The picketing was at all times peaceful, the record disclosing no evidence whatsoever of violence or threats of violence. Upon the establishment of the picket line, plaintiff's union warehousemen ceased work, and union truck drivers refused to haul plaintiff's merchandise, the result of the picketing being that plaintiff's business was, to a great extent, stopped.

May 1, 1940, representatives of the union met with plaintiff's salesmen, and under the direction of Federal officials, plaintiff's salesmen voted by secret ballot upon the matter of joining the union, the salesmen again unanimously voting in the negative. From the evidence it appears that the union, by phone calls and letters, informed certain of plaintiff's customers that the union had declared plaintiff unfair, and requested that plaintiff's customers cooperate in inducing plaintiff to unionize its establishment. May 23, 1940, plaintiff filed its complaint in this action, naming as defendants the union above referred to, together with several other labor unions, the Central Labor Council of Seattle, and many individuals, members of one or other of defendant unions.

Thereafter the nine salesmen in plaintiff's employ filed a complaint in intervention, plaintiff and the interveners both, after alleging facts above epitomized, asking that the defendants be enjoined and restrained from picketing plaintiff's business, or in any manner interfering with the selling and distribution of plaintiff's products, and that defendants be enjoined from interfering in any way with plaintiff's customers. Plaintiff demanded judgment against defendants for damages in the sum of twenty-five thousand dollars, and for such further sums as the evidence on the trial

might show plaintiff was entitled to by way of damages.

The action came on regularly for trial before the court, which, June 20, 1940, granted a temporary injunction and restraining order against defendants, enjoining the picketing of plaintiff's establishment, and also enjoining any boycott against plaintiff's business. Thereafter, by stipulation of the parties, it was agreed that the cause be submitted to the court for final judgment on the merits, on the testimony theretofore taken, and the briefs and argument submitted, plaintiff agreeing to withdraw its demand for damages.

June 26, 1940, final decree in the action was entered in the form of a permanent injunction against defendants, the court finding that no labor dispute existed between the plaintiff and the defendant unions, and that the defendants should be permanently enjoined from picketing plaintiff's place of business or from interfering in any way with plaintiff's affairs. From this decree of permanent injunction, defendants have appealed.

Appellants assign error upon the holding of the trial court that the evidence did not show the existence of a labor dispute between respondent and appellant union. Error is also assigned upon the decree of the court permanently enjoining picketing of respondent's place of business, and that portion of the decree enjoining any boycott against respondent's business, and restraining appellants from publishing, either by picketing or otherwise, any declarations that respondent had been declared unfair to union labor. Appellants also assign error upon the refusal of the trial court to hold that appellants' right to picket respondent's place of business is protected by the constitution of the United States.

The interveners above referred to have not appeared

before this court, the original plaintiff appearing as respondent herein.

The trial court, in holding that no labor dispute existed between respondent and appellants, followed the opinions of this court in the cases of *Safeway Stores v. Retail Clerks' Union*, 184 Wash. 322, 51 P. (2d) 372; *Adams v. Building Service Employees etc. Union*, 197 Wash. 242, 84 P. (2d) 1021; and *Fornili v. Auto Mechanics Union*, 200 Wash. 283, 93 P. (2d) 422. The opinion in the later case of *Shively v. Garage Employees Local Union*, 6 Wn. (2d) 560, 108 P. (2d) 354, is to the same effect.

In the case at bar, none of respondent's salesmen was a member of appellant union. It appears from the evidence that some of the salesmen were at the time of the trial of the action, or had previously been, members of other unions, and appellants argue that for this reason a labor dispute was presented. The fact that some of the salesmen had been or were members of other unions, no one of such unions being engaged in any controversy with respondent, did not cause the facts before the court to present a labor dispute, within our decisions above cited.

Appellants also argue that, because prior to April 1, 1940, respondent's coffee was sold by union men in the employ of the McGregor Company, a labor dispute was presented. On or about April 1, 1940, respondent ceased to dispose of its coffee through the McGregor Company, and undertook to sell its own coffee. The fact that this product had been sold at some prior time through an agent employing union men, had no bearing upon the situation presented to the court on the trial of the case at bar.

In the case of *Thornhill v. Alabama*, 310 U. S. 88, 84 L. Ed. 1093, 60 S. Ct. 736, the supreme court of the United States held that a state statute prohibiting

picketing was contrary to the constitutional right of freedom of speech guaranteed by the first and fourteenth amendments to the Federal constitution. In the case of *Carlson v. California,* 310 U. S. 106, 84 L. Ed. 1104, 60 S. Ct. 746, the supreme court held void a municipal ordinance prohibiting picketing as also violative of the fourteenth amendment. In the case of *Milk Wagon Drivers Union v. Meadowmoor Dairies,* 312 U. S. 287, 85 L. Ed. 836, 61 S. Ct. 552, it was held that a state court could enjoin picketing when it appeared that the picketing was enmeshed with, and set in a background of, violence against the employer.

The decisions of the supreme court of the United States above referred to embody the principle that the right to peacefully picket is protected under the fourteenth amendment to the Federal constitution, in cases where the picketing is no part of any concerted plan or campaign involving violence.

In the case at bar, the principal question presented is whether the right to peacefully picket the plant of an employer is protected by the first and fourteenth amendments to the Federal constitution, where there is no employer-employee relationship existing between the employer picketed and the members of the union involved in the controversy.

The supreme court of the United States, in the case of *American Federation of Labor v. Swing,* 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568, held that the union was within its rights in picketing Swing's beauty shop, although none of the employees of the establishment was a member of the picketing union. The court directly held that the constitutional guaranty of freedom of discussion protected the right of the union to peacefully picket, even though no union member stood in an employer-employee relationship with the employer.

The case last cited is controlling here. It is true that in the case at bar the picketing of respondent's establishment resulted in the refusal of respondent's warehousemen to cross the picket line, and in the refusal of union teamsters to haul respondent's merchandise. These factors were not present in the *Swing* case, but the fact that they exist here does not render the decision of the supreme court of the United States any less applicable to the situation here presented.

The record does not indicate that any of the acts of appellants suggested the employment of violence against respondent, its employees, or any of its customers. Respondent argues that appellants' right to picket is not protected under the constitution of the United States, because the picketing tended to introduce into the dispute the suggestion that respondent's employees and customers had reason to fear that they would become the objects of violence on the part of members or agents of appellant union. It is also argued that the picketing was accompanied by and associated with an illegal secondary boycott indicated by letters and telephone calls to respondent's customers.

Disposing of the latter argument first, the trial court was of the opinion that the evidence was insufficient to establish the existence of a secondary boycott, and while some operations of doubtful legality were conducted by appellants, which suggested the possible inauguration of a secondary boycott, we agree with the trial court in its ruling that the evidence failed to show any such secondary boycott.

The record indicates that the picketing of respondent's establishment was peaceable, and was accompanied by no actual or threatened violence.

In this connection, the case of *Wohl v. Bakery & Pastry Drivers etc.*, 259 App. Div. 868, 19 N. Y. S. (2d)

811, should be considered. The supreme court, appellate division, awarded an injunction at the suit of several peddlers of bakery products, enjoining the defendant union from picketing. The court of appeals, without opinion, affirmed the judgment. *Wohl v. Bakery & Pastry Drivers etc.,* 284 N. Y. 788, 31 N. E. (2d) 765. On certiorari to the supreme court of the United States, the judgment of the state court was reversed upon authority of the case of *American Federation of Labor v. Swing, supra. Bakery & Pastry Drivers etc. v. Wohl,* 313 U. S. 548, 85 L. Ed. 1513, 61 S. Ct. 1108.

The supreme court of the United States has clearly laid down the rule governing such picketing as was maintained by appellants, and under the cases cited, with particular reference to the *Swing* case, we are constrained to hold that the trial court erred in permanently enjoining appellants from continuing the picketing in a peaceable and orderly manner.

The decree appealed from is reversed.

MAIN, BLAKE, SIMPSON, and DRIVER, JJ., concur.

STEINERT, J., dissents.

MILLARD, J. (concurring in the result)—I concur in the result. *Zaat v. Building Trades Council,* 172 Wash. 445, 20 P. (2d) 589, forecloses question here raised even if opinions in *O'Neil v. Building Service Employees,* 9 Wn. (2d) 507, 115 P. (2d) 662; *American Federation of Labor v. Swing,* 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568; and *Bakery & Pastry Drivers etc. v. Wohl,* 14 N. Y. S. (2d) 198, 19 N. Y. S. (2d) 811, 284 N. Y. 788, 31 N. E. (2d) 765, 313 U. S. 548, 85 L. Ed. 1513, 61 S. Ct. 1108, had never been written.

ROBINSON, C. J. (concurring in the result)—As a practical matter, the ultimate effect of the foregoing

opinion will be that the nine salesmen involved in this action will be compelled to join the picketing union or lose their jobs. Their employer may be able, for a little while, to maintain its hitherto correct attitude of neutrality, but sooner or later, as a matter of self-preservation, it will have to abandon it; for, although it be able to weather the concentrated drive being made upon its customers, it will not be able to secure special services made necessary by breakdowns or required from time to time to make necessary repairs, alterations, and physical improvements, so long as even one picket exercises his right of freedom of speech *in front of its premises.*

A picket line is sacrosanct, a barrier which may not be crossed without risking severe pains and penalties. It is not what the picket says, but his *locus in quo* which proximately causes the desired result. This being so, were it not for the all-inclusive interpretation placed upon the words "freedom of speech" by the supreme court of the United States in the *Swing* case, one might well justify a dissent from the majority opinion upon the ground that impelled the late Mr. Justice Brandeis to dissent in the case of *Di Santo v. Pennsylvania,* 273 U. S. 34, 43, 71 L. Ed. 524, 529, 47 S. Ct. 267, in which he said, Mr. Justice Holmes concurring:

"In the case at bar . . . the logic of words should yield to the logic of realities."

I concurred in the *result* of the recent opinion of this court in *O'Neil v. Building Service Employees International Union, Local No. 6,* 9 Wn. (2d) 507, 115 P. (2d) 662, in the belief that the opinion of the supreme court of the United States in the *Swing* case required that result. It was vigorously contended, at the hearing of the instant case, that it did not. That it did is now clear beyond all question. In support

of that statement, I cite the action of the supreme court of the United States in the case of *Bakery & Pastry Drivers etc. v. Wohl,* 313 U. S. 548, 85 L. Ed. 855, 61 S. Ct. 1108, a case so recently and so inconspicuously decided that it was not called to our attention until a month after our decision in the *O'Neil* case had been rendered. The facts of the case are best stated in the opinion rendered in the cause by the supreme court of New York, 14 N. Y. S. (2d) 198, from which I quote as follows:

"Each of the two plaintiffs are peddlers engaged in the business of buying baked food products from different manufacturing bakers and reselling them to grocery stores. Each is the owner of a truck used by him in the distribution of his wares. One of the plaintiffs, Wohl, has been a peddler for five years and the other, Platzman, for two years. Wohl buys his merchandise from four different bakeries and Platzman from two. Neither one has any contractual relation with any of these bakeries. The earnings of the plaintiffs are based upon the difference between the purchase and the resale price of the products. The approximate income of Wohl is about $32 weekly from which he supports his mother and two motherless daughters. He works about thirty-three hours a week and has no employee.

"Platzman also has no assistant, is married and an expectant father and his income is about $35 weekly, derived from a working schedule of sixty-five hours.

"These plaintiffs seek a permanent injunction restraining the defendant union from picketing the places of business of the manufacturing bakers who sell to them and of the customers who buy from them. The proof is that the defendant threatens to picket these manufacturers and the various customers of the plaintiffs unless each of the plaintiffs employ a member of the defendant union one day a week to assist them. The place of business of the Diamond Baking Company, one of the manufacturers selling to the plaintiffs, has already been picketed. Another manufacturer was also picketed for a short period.

"The plaintiffs contend that they are engaged in an independent calling and that their meagre earnings are insufficient to permit them in justice to their families to employ a union member for one day a week."

The supreme court granted the injunction. The appellate division of that court affirmed it, two judges dissenting, 19 N. Y. S. (2d) 811. Upon appeal to the New York court of appeals, it was again affirmed, all judges concurring, 284 N. Y. 788, 31 N. E. (2d) 765. An application for writ of certiorari was made to the supreme court of the United States. It disposed of the cause in an opinion so brief that it may be quoted in its entirety (citation, *supra*):

"*Per Curiam:* The petition for rehearing is granted. The order denying certiorari, *post,* p. 572, is vacated and the petition for writ of certiorari is granted. The judgment is reversed. *American Federation of Labor v. Swing,* 312 U. S. 321."

This decision goes much farther than we are required to go in order to reverse the judgment in the instant case. In that case, the picketing union exercised its right of freedom of speech for the express purpose of interfering with the personal undertakings of Wohl and Platzman, neither of whom had any employees whatever. In the instant case, since the S and W Fine Foods, Inc., are employers of labor, the picketing union has at least a semblance of legitimate interest. In that case, the union picketed, not only the respective plaintiffs' sources of supply, but threatened to picket their customers as well. In this case, the union merely picketed the employer's plant. Furthermore, in that case, the consequences to the plaintiffs of the refusal to afford injunctive protection will be exceedingly drastic. It appears that each of the two plaintiffs in that case was scarcely able to support his family. Platzman, working sixty-five hours per week,

was able to make but thirty-five dollars per week. Denied protection, he will be compelled to employ union help. Violent changes will have to be made in his modest business venture, assuming that he can continue to carry it on at all. In this case, the nine salesmen can continue to work as usual—if they will but pay an initiation fee to the picketing union, and a monthly royalty for the privilege, and submit themselves in various ways to its government and control.

This court is bound to take note of the fact that the supreme court of the United States has recently so profoundly altered the rules of law governing the matter before us as to destroy the force and authority of many of its previous decisions. It formerly held—and until very recently—that the right of freedom of speech "is not absolute," but "is subject to restriction and limitation." This was said in *Gilbert v. Minnesota,* 254 U. S. 325, 332, 65 L. Ed. 287, 290, 41 S. Ct. 125, decided in 1920, and we have it on good authority that at least as late as 1931 the court was still of that opinion; for, in an article published during that year by the then Professor Frankfurter of the Harvard law school, now Mr. Justice Frankfurter of the supreme court and author of the opinions in the *Swing* and *Meadowmoor* cases, we find the following statement:

"Together with his colleagues, Mr. Justice Brandeis has refused to make freedom of speech an absolute." (Mr. Justice Brandeis and The Constitution, 45 Harvard Law Review 33, 88.)

[See the dissenting opinion of Mr. Justice Brandeis in *Schaefer v. United States,* 251 U. S. 466, 482-483, 64 L. Ed. 360, 367, 40 S. Ct. 259, in which he says, in substance, that the rule is that one may not speak freely where the words used are used in such circumstances and are of such a nature as to create a clear and present danger. This, he says, "is a rule of reason,"

and, "like many other rules for human conduct, it can be applied correctly only by the exercise of good judgment; . . . "]

In pronouncing the unanimous opinion of the court in *Schenck v. United States,* 249 U. S. 47, 52, 63 L. Ed. 470, 473, 39 S. Ct. 247, Mr. Justice Holmes said:

"We admit that in many places and in ordinary times the defendants in saying all that was said in the circular would have been within their constitutional rights. *But the character of every act depends upon the circumstances in which it is done. Aikens v. Wisconsin,* 195 U. S. 194, 205, 206. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. *It does not even protect a man from an injunction against uttering words that may have all the effect of force."* (Italics mine.)

If that remained the law, we would be justified in affirming the decree of the trial court; for, without taking the time and space to detail the circumstances under which the picketing was done, it may be said that they were fully sufficient to give the words spoken and displayed "all the effect of force." But the law, as announced in the *Meadowmoor* and *Swing* decisions, allows no restraint of the freedom of speech of at least one of the parties to a labor controversy, unless and until the words spoken are punctuated and emphasized by such acts of violence as are enumerated in the opinion in the *Meadowmoor* case (312 U. S. 287, 85 L. Ed. 836, 61 S. Ct. 552), to wit, the destruction of property by fire, the use of explosive and stench bombs, the smashing of windows, the burning of trucks and driving them into the river, shooting at workmen, holding them up with guns and beating them over the head while advising them "to join the union."

As none of these acts or any acts at all resembling them are shown to have taken place in the instant

case, and since the opinions of the supreme court on the question presented are binding upon us, I feel compelled to concur in the result reached by the majority. But beyond that I cannot go.

I cannot believe that the right to freedom of speech is so absolute, unlimited, and overriding that persons and associations acting in concert may not be legally restrained from employing it as an effective instrument to destroy the right of freedom to work. It would seem, when two civil liberties come into direct and irreconcilable conflict, and one of them is more fundamental than the other, that the more fundamental should prevail. That the right of freedom to work is more fundamental than the right of freedom of speech is axiomatic. There have been occasions where heroic souls, under great spiritual exaltation, have deemed the right to speak freely and without restraint to be even more precious than the right to live, but such occasions are rare. The generality of mankind has, in all ages and at all times, been compelled to work in order to live and engage in the pursuit of happiness. The right to work is, obviously, the most fundamental of human rights because it is only by its exercise that life itself can be maintained.

The first amendment to the Federal constitution protects the right of free exercise of religious belief, the right of freedom of speech, the right of freedom of the press, the right of assemblage, and the right to petition for redress of grievances. Nothing is said therein, or elsewhere in the constitution, of the right of freedom to work. Yet, it cannot be excluded from the category of civil rights by the rule *expressio unius est exclusio alterius*. The men who insisted upon the addition of the first ten amendments to the constitution, as a condition to its adoption, felt that the existence of the rights listed therein could not safely be

taken for granted, but should receive the sanction of express inclusion. They knew that, historically, those rights had developed out of governmental experience, that they were rights granted by governments as and when their desirability became apparent, and that they had been customarily sanctioned by express statutes, such as the English Bill of Rights. They, therefore, thought it prudent that they should be expressly enumerated. But the men of that time considered the right to work, to live, and to engage in the pursuit of happiness to be of a higher and more fundamental character. They conceived it to be a natural right conferred upon all men by the Creator of the Universe, and, therefore, in no need of the protection of written law. They, in fact, considered it so fundamental in character as not even to be subject to governmental limitation. Of this the evidence is clear, cogent, overwhelming, and irrefutable.

On the sixth day of May, 1776, a convention of delegates and representatives from the several counties and corporations of the colony of Virginia met at the city of Williamsburg. Although the independence of the American colonies had not yet been declared, the members of that convention evidently expected that they would shortly be faced with the task of establishing a new government, for they straightway set about formulating a series of declarations of the fundamental principles which should control such an adventure. After a prolonged debate, the declarations agreed upon were adopted by a unanimous vote on June 12. The very first of these read as follows:

"That all men are by nature equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, *with the means of acquiring* and possessing *property,* and pursu-

ing and obtaining happiness and safety." Vol. 9, p. 109, Hening's Statutes at Large. (Italics mine.)

On the following July 4, the thirteen colonies, through their representatives assembled at Philadelphia, adopted the same principles as their justification for declaring their independence; for, after reciting, by preamble, that a decent respect for the opinions of mankind required that they should declare the causes which impelled them to the separation, they proceeded at once to make the declaration which begins:

"We hold these truths to be self-evident: That all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; that, to secure these rights, governments are instituted among men, . . . "

In the short period of less than one year we have been swiftly and steadily led away from the fundamental principles upon which our government was founded to a point where we now judicially ignore a fundamental, "inalienable" right which it was instituted to secure; for, during that brief period, it has been made manifest that the law will no longer protect the right of our citizens to freely work, acquire property, and engage in the pursuit of happiness, whether they attempt to exercise that right by the method of working for hire or, as Hyman Wohl and Louis Platzman of New York elected to do, by striving for themselves and their respective families single-handed and alone.

Was it the possession of sound and historical knowledge, or a kind of prophetic insight, that induced the statesmen of old Virginia to attach to the declarations adopted at Williamsburg on June 12, 1776, the following admonition:

"That no free government, or the blessing of liberty, can be preserved to any people but by a firm adherence to justice, moderation, temperance, frugality, and virtue, *and by frequent recurrence to fundamental principles.*" (Italics mine.)

JEFFERS, J. (concurring in the result)—I concur in the result reached by the majority for the reasons assigned by Judge Robinson, and I am in entire accord with what Judge Robinson has said in his concurring opinion.

[1]Reported in 118 P. (2d) 961.