[No. 28348.  *En Banc.*  December 4, 1941.]

WEYERHAEUSER TIMBER COMPANY, *Appellant,* v. EVERETT
DISTRICT COUNCIL OF THE LUMBER & SAWMILL
WORKERS *et al., Respondents.*[1]

*W. E. Heidinger* and *T. J. Hanify,* for appellant.

*L. Presley Gill,* for respondents.

BLAKE, J.—Plaintiff brought this action for an in-
junction to restrain defendants from picketing three of
its plants at Everett.  The defendants are Everett Dis-

[1]Reported in 119 P. (2d) 643.

trict Council of the Lumber & Sawmill Workers, J. W. Whitley, its president, D. F. Pearson, its secretary and business agent, and various local unions and their officers. These unions are all chartered by the United Brotherhood of Carpenters and Joiners of America, an affiliate of the American Federation of Labor. The local union directly involved in the controversy is Lumber & Sawmill Workers Union, Local No. 2653.

In 1937, the latter entered into a working agreement with the plaintiff, which covered the three plants around which this controversy revolves. The defendant Local 2653 gave notice of termination of that agreement on April 15, 1939. Subsequently, there was sporadic picketing of plaintiff's plants, which was discontinued about the middle of September, 1940.

Under date of October 25, 1940, defendant Everett District Council made demand upon the plaintiff for "a seventy cent (70c) per hour minimum wage and a week's vacation with pay, with a corresponding increase for all bracket men." On October 24th, a strike had been called for October 29th unless, in the meantime, their demands were met. At that time, not more than twelve members of Local 2653 were working in plaintiff's mills at Everett. Aside from officers and supervisory employees, the plaintiff was then employing 1,277 men, 858 of whom had joined the Industrial Woodworkers of America, which is chartered by the Committee for Industrial Organization. At about the same time, a majority of its employees in the Everett mills having designated Industrial Woodworkers of America as their bargaining agent, plaintiff entered into a working agreement with that organization. Learning that such an agreement was contemplated, Local 2653, on October 17th, informed plaintiff as follows:

"We, at this time, wish to notify you that we protest any claim by the I. W. of A. to represent a majority of

your employees, and we also protest the making of any agreement between your company and that organization."

At or about the time the agreement between plaintiff and the Industrial Woodworkers of America was entered into, Local 2653 called a strike and, on October 29th, threw a picket line around two of the plants. On that day and until a temporary restraining order was issued in this action, several hundred pickets were in line. There were threats, but no acts of violence were perpetrated.

Upon the hearing for an injunction *pendente lite,* the court entered an order by which defendants were

" . . . enjoined, restrained and prohibited from picketing any of the mills or premises of the plaintiff in or immediately north of the City of Everett, Snohomish County, Washington, in any manner other than by maintaining not more than five pickets or persons at or near the main entrance to plaintiff's mills 'B' and 'C' immediately north of said City of Everett to, in a peaceable and orderly manner, advise the public or persons entering said premises of the existence of, or facts concerning, a labor dispute or strike at said mills; and . . . enjoined, restrained and prohibited from in any manner whatever interfering with, molesting, hindering, delaying, obstructing or preventing any persons whomsoever, whether employees of the plaintiff, or customers thereof, or otherwise, from entering or leaving any part of plaintiff's aforesaid premises at any time, in any manner, or for any purpose; . . ."

The final decree was similar in terms and to the same effect, except in one particular:

"Provided that the said defendants be and they are hereby permitted to use a boat displaying a banner with the legend 'Weyerhaeuser Timber Co. Mills B and C are unfair to organized labor—We are on strike for more money—Lumber & Sawmill Workers, A. F. of L.' and to use said boat for the purpose of publicizing

the true facts of any dispute between the parties by patrolling in the Snohomish River and in Puget Sound, but at least one-quarter of a mile distant from any dock, wharf or booming grounds of the plaintiff; . . ."

From this decree, plaintiff appeals.

Appellant contends that the injunction should have been broader in scope—restraining picketing of any kind. It bases this contention on two theories: First, that the provisions of the Laws of 1933, Ex. Ses., chapter 7, p. 10 (Rem. Rev. Stat. (Sup.) § 7612-1 [P. C. § 3467-21] *et seq.*), the anti-injunction act, are inapplicable because (a) no labor dispute existed between it and its employees, and (b) the picketing, in its inception, was accompanied by violence; second, that, having, in compliance with the national labor relations act, 29 U. S. C. A. (Sup.), §§ 157, 158(5), recognized and entered into a working agreement with the Industrial Woodworkers of America, the bargaining agency chosen by a majority of the employees, appellant cannot be subjected to picketing by a minority of its employees.

*First.* (a) Contending that no labor dispute existed, appellant relies upon our decisions in *Safeway Stores v. Retail Clerks' Union,* 184 Wash. 322, 51 P. (2d) 372; *Fornili v. Auto Mechanics' Union, etc.,* 200 Wash. 283, 93 P. (2d) 422; and *Shively v. Garage Employees Local Union No. 44,* 6 Wn. (2d) 560, 108 P. (2d) 354. In those decisions, the court held that a labor dispute does not exist unless there is a master and servant relationship between the strikers and the proprietor of the struck shop. Obviously, the decisions have no application here, for such employer-employee relationship did exist between appellant and its employees who were members of Local 2653. The fact that they constituted a small minority made their controversy with appellant none the less a labor dispute. *American Steel Foundries v. Tri-City Central Trades*

*Council,* 257 U. S. 184, 66 L. Ed. 189, 42 S. Ct. 72; *Fur Workers Union, Local No. 72 v. Fur Workers Union,* 105 F. (2d) 1.

■ (b) Contending that the restriction on the power to grant injunctions imposed by Rem. Rev. Stat. (Sup.), § 7612-13 [P. C. § 3467-33], is not applicable when picketing is accompanied by violence, appellant cites the recent case of *Milk Wagon Drivers Union v. Meadowmoor Dairies,* 312 U. S. 287, 85 L. Ed. 836, 61 S. Ct. 552.

That case is clearly distinguishable from this. The injunction granted by the district court in that case was sustained because of continuing acts of violence resulting in injury to persons and damage to property. Even so, the court there said:

"The injunction which we sustain is 'permanent' only for the temporary period for which it may last. It is justified only by the violence that induced it and only so long as it counteracts a continuing intimidation. Familiar equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer warranted. *Here again, the state courts have not the last say. They must act in subordination to the duty of this Court to enforce constitutional liberties even when denied through spurious findings of fact in a state court.*" (Italics ours.)

In this case, there was no damage or destruction of property nor assault upon persons. There was, of course, not only the threat of violence inherent in mass picketing, but also actual threats of violence, which would, no doubt, have been carried into action but for the submission of the persons to whom they were addressed. But we do not think that respondents, for that reason, forfeited their now well-established right of peaceful picketing. *O'Neil v. Building Service Employees Union,* 9 Wn. (2d) 507, 115 P. (2d) 662; *Edwards v. Teamsters Local Union No. 313,* 8 Wn. (2d)

492, 113 P. (2d.) 28; *Thornhill v. Alabama,* 310 U. S. 88, 84 L. Ed. 1093, 60 S. Ct. 736; *Carlson v. California,* 310 U. S. 106, 84 L. Ed. 1104, 60 S. Ct. 746; *American Federation of Labor v. Swing,* 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568. Indeed, the supreme court of the United States upheld the right of peaceful picketing in *American Steel Foundries v. Tri-City Council, supra,* notwithstanding the dispute had its inception in mass picketing accompanied by force and violence. The late Chief Justice Taft, speaking for the court, said:

"A restraining order against picketing will advise earnest advocates of labor's cause that the law does not look with favor on an enforced discussion of the merits of the issue between individuals who wish to work, and groups of those who do not, under conditions which subject the individuals who wish to work to a severe test of their nerve and physical strength and courage. *But while this is so, we must have every regard to the congressional intention manifested in the act and to the principle of existing law which it declared, that ex-employees and others properly acting with them shall have an opportunity, so far as is consistent with peace and law to observe who are still working for the employer, to communicate with them and to persuade them to join the ranks of his opponents in a lawful economic struggle.* Regarding as primary the rights of the employees to work for whom they will, and, undisturbed by annoying importunity or intimidation of numbers, to go freely to and from their place of labor, and keeping in mind the right of the employer incident to his property and business to free access of such employees, what can be done to reconcile the conflicting interests?

"Each case must turn on its own circumstances. It is a case for the flexible remedial power of a court of equity which may try one mode of restraint, and if it fails or proves to be too drastic, may change it. We think that the strikers and their sympathizers engaged in the economic struggle should be limited to one representative for each point of ingress and egress in the plant or place of business. . . . " (Italics ours.)

*Second.* Appellant takes the position that, since, in conformity with the national labor relations act (29 U. S. C. A. (Sup.), § 151 *et seq.*), it has entered into an agreement with the bargaining agent (Industrial Woodworkers of America) chosen by a majority of its employees, it is immune to picketing by a minority group.

One of the "unfair labor practices" defined by the act is refusal of the employer to "bargain collectively with the representatives of his employees, . . . " 29 U. S. C. A. (Sup.), § 158 (5). There are a number of cases in which this section of the act has been applied in accordance with its literal terms. *National Labor Relations Board v. Piqua Munising Wood Products Co.,* 109 F. (2d) 552; *National Labor Relations Board v. Louisville Refining Co.,* 102 F. (2d) 678; *National Labor Relations Board v. Dahlstrom Metallic Door Co.,* 112 F. (2d) 756; *Standard Lime & Stone Co. v. National Labor Relations Board,* 97 F. (2d) 531.

Appellant argues that, a working agreement having been entered into between it and the chosen representatives of a majority of its employees, any conduct of a minority group which tends to interfere with such agreement must be held to be unlawful. The argument, in other words, is that, since appellant was bound under § 158 (5) of the act to bargain with the Industrial Woodworkers of America or take the risk of being charged with "unfair labor practices," it must necessarily follow that all of its employees are bound by the agreement.

There is much force in the argument. But the act does not expressly so provide. The right to strike, however, is expressly saved in § 163 of the act. And the Federal courts generally hold that, pending certification of a bargaining agency by the National Labor Relations Board, the attendant right of peaceful picket-

ing is in nowise restricted by the act. *Lund v. Woodenware Workers Union,* 19 F. Supp. 607; *Blankenship v. Kurfman,* 96 F. (2d) 450; *Cupples Co. v. American Federation of Labor,* 20 F. Supp. 894; *Sharp & Dohme v. Storage Warehouse Employees Union, etc.,* 24 F. Supp. 701; *Fur Workers Union, Local No. 72 v. Fur Workers Union,* 105 F. (2d) 1, *supra.*

The facts in the above-cited cases are in no essential respect distinguishable from those in the case at bar. The holdings in those cases may be epitomized in a quotation from *Black Diamond S. S. Corp. v. National Labor Relations Board,* 94 F. (2d) 875:

"So long as the bargaining agency was doubtful and the election was being held by order of the Board, the parties were left to their relative economic advantages and were without remedies under the act. . . . They struck at a time when the Board was conducting an election. Since the act expressly leaves the right to strike unaffected, any remedies they had were unaffected by continuing on strike."

In *Lund v. Woodenware Workers Union, supra,* which has been cited with approval in most of the decisions dealing with the question under consideration here, it is said:

"Plaintiff presumably is correct in his position when he avers that, under the terms of the Wagner Act, he cannot bargain collectively with the representatives of the minority, and if he assumes to do so, he may be guilty of unfair labor practice, but the determination of his course in dealing with his employees is nevertheless not for the courts. Whether the particular group that it is alleged constitutes a majority should bargain for all the workers in the various departments of plaintiff's factory, is not under the court's supervision. This court cannot assume the authority granted to the Board, nor is there any showing that the Labor Board will ignore the questions which have arisen concerning the representatives of the employees for collective bargaining in this factory. If the employer is

powerless under the act to initiate any proceedings, as plaintiff contends, then of course it would seem that Congress might well remedy that situation. . . .

"The difficulty with the assumption of jurisdiction herein on the theory that plaintiff's case arises under the Wagner Act is due to the very apparent fact that the right that the plaintiff seeks to enforce is not created, either expressly or impliedly, by the federal statute in question, but by this proceeding he seeks to read into the act certain rights on behalf of the employer to proceed in a court of equity which Congress studiously refrained from giving to the employer. The courts cannot create a right that Congress did not see fit to grant. If any relief were granted under the complaint, the court would be legislating in a field where Congress failed to take action. *Further, it should be noticed that there is no provision in the Wagner Act which makes it illegal for a minority to strike and to seek thereby to obtain sufficient strength so as to become the sole bargaining agency.* . . .

" . . . The court having determined that under no circumstances can a contract between an employer and his employees be considered a subject matter for a federal court under the Wagner Act, *at least in absence of an approval or sanction of that contract by the National Labor Relations Board, it must necessarily follow that plaintiff's bill of complaint does not present a substantial question arising under a federal statute.*" (Italics ours.)

Appellant cites our own case of *Bloedel Donovan Lbr. Mills v. International Woodworkers,* 4 Wn. (2d) 62, 102 P. (2d) 270, where the court granted an injunction under a state of facts indistinguishable from those in the case at bar except in one particular: another union, Lumber & Sawmill Workers Union, Local No. 2667, had been certified by the National Labor Relations Board as the bargaining agent of plaintiff's employees. The holding in that case is not only in harmony with the above-cited Federal cases, but also with the case of *Oberman & Co. v. United Garment Workers,*

21 F. Supp. 20, where, in a like situation, the same conclusion was reached.

We think the injunction issued in this case is as broad as the court was warranted in granting in the light of the cited decisions of this court, of the supreme court of the United States, and of the Federal courts. The decree will, therefore, be affirmed.

MAIN and DRIVER, JJ., concur.

STEINERT, J. (dissenting)—This court, in common with nearly all the courts of this country, including particularly the United States supreme court, has in recent years held that "peaceful picketing" as such is lawful and may not be enjoined. But what is "peaceful picketing"? The meaning of that term or, more properly, the scope of permissible activity included therein, is the rock upon which the claims of individuals, and the pronouncements of judges as well, have split.

If all men were agreed, or accepted the principle, that "peaceful picketing" is simply a method of human communication through which an individual, or a group of individuals, by means of the spoken word, the inscribed letter, or the printed sign, endeavors to make known his, or their, ideas, contentions, or aspirations with regard to a matter of public interest, to another or others willing to be informed thereon, with the accompanying purpose of persuading the listener or observer that the cause or claim of the communicant is righteous or just, and of winning the sympathy or even the legitimate active support of the person or persons thus addressed, there would seldom if ever be occasion for judicial pronouncement or even for personal dispute concerning the right of the one purveying such information to do so. But if the dimensions of "peaceful picketing" are limited only by the ends

sought to be gained, regardless of the means employed or of the by-products of its exercise, then there arises the question whether the asserted right of communication is absolute and predominant, sanctioned and protected by the supreme law of the land, or whether it is a relative right only, to be exercised in consonance with the equally protected rights of others and subject to limitations or restraint at the hands of a judicial tribunal.

It has never been successfully contended by anyone that the right is absolute, that the ends justify the means, or that an unwarranted exercise of the privilege may not be restrained. Indeed, the term "peaceful picketing," though in itself a mixed metaphor, has always been understood, by the courts at least, as the incarnate vehicle of *persuasion,* devoted to the art or power of influencing the mind of another by statement, argument, reason, entreaty, or appeal. The delicate, and usually difficult, question is just how far one may go in the propulsion of that vehicle. Does he occupy the status of one who is always on, *and in,* the right, before whom all other travelers must immediately come to a stop and ultimately follow his course, regardless of their own intended destination, or is he, too, but a traveler who must recognize the rights of others on the highway of human affairs and at times give way to the crosscurrents of social relations?

To ask the question seemingly is to answer it. At any rate, it has been definitely and comprehensively answered by the highest judicial tribunal in this country, the United States supreme court. The precise matter came to a pointed head in the case of *American Steel Foundries v. Tri-City Central Trades Council* (1921), 257 U. S. 184, 66 L. Ed. 189, 42 S. Ct. 72, 27 A. L. R. 360, a case upon which the majority opinion herein relies and from which it makes liberal quotation. In that

case, Chief Justice Taft, speaking for the majority of the court, thus posed and answered the very question with which we are here primarily faced:

"How far may men go in persuasion and communication and still not violate the right of those whom they would influence?  In going to and from work, men have a right to as free a passage without obstruction as the streets afford, consistent with the right of others to enjoy the same privilege.  We are a social people and the accosting by one of another in an inoffensive way and an offer by one to communicate and discuss information with a view to influencing the other's action are not regarded as aggression or a violation of that other's rights.  If, however, the offer is declined, as it may rightfully be, then persistence, importunity, following and dogging become unjustifiable annoyance and obstruction which is likely soon to savor of intimidation. From all of this the person sought to be influenced has a right to be free and his employer has a right to have him free."

If "persistence, importunity, following and dogging" do not come within the limits of "peaceful picketing," it goes without saying that actual obstruction, threats, intimidation,. and violence are still further without the circle of its permissibility.

It is instructive to note that, in the *Tri-City* case, *supra,* the court demonstrated the effect of its answer to the question it had itself propounded, by sustaining an injunction against obstruction, intimidation, threats, or violence, but at the same time denying an injunction against peaceable communication and persuasion. It is also worthy of note that the court specifically stated that each case must turn on its own circumstances and that it becomes a question for the judgment of the chancellor, who has heard the witnesses, familiarized himself with the *locus in quo,* and observed the tendencies to disturbance and conflict, the purpose always being to prevent the inevitable intimidation

occasioned by the presence of groups of pickets, but yet to allow "missionaries" for the furtherance of the legitimate objectives attainable by true peaceful picketing.

In the same term of court (December, 1921) in which the *Tri-City* case, *supra,* was decided, the supreme court of the United States also pronounced its decision in the case of *Truax v. Corrigan,* 257 U. S. 312, 66 L. Ed. 254, 42 S. Ct. 124, 27 A. L. R. 375. In that case, the majority opinion held invalid, as being in contravention of the fourteenth amendment, a statute of the state of Arizona which withdrew from the courts the right to issue injunctions in cases arising out of disputes between employers and employees concerning terms or conditions of employment, unless interposition by injunction should be necessary to protect property from injury through violence. Although there was a serious division in the personnel of the court upon the main question there involved, it was recognized by all of the justices, by express statement, that *peaceful* picketing was lawful.

That case is of particular interest in the present connection, however, because of the dissenting opinion by Mr. Justice Brandeis, whose thesis was that

"A State is free since the adoption of the Fourteenth Amendment, as it was before, not only to determine what system of law shall prevail in it, but, also, by what processes legal rights may be asserted, and in what courts they may be enforced,"

and

"so it [the state] may determine for itself, from time to time, whether the protection which it affords to property rights through its courts shall be given by means of the preventive remedy or exclusively by an action at law for compensation."

While the dissenting opinion upheld the right of Arizona to enact a statute withdrawing the remedy by

injunction in such cases, it as fully recognized the right of other states to preserve to their courts the authority to issue injunctions in the same character of cases. The point is mentioned here only for the reason that, in this state, it has been decided, in cases involving labor disputes, that the courts are vested with power, in the exercise of their equity jurisdiction, to issue writs of injunction, and that such power cannot be abolished or abridged by the legislature. *Blanchard v. Golden Age Brewing Co.*, 188 Wash. 396, 63 P. (2d) 397; *Chin On v. Culinary Workers & Soft Drink Dispensers Union*, 195 Wash. 530, 81 P. (2d) 803; *Adams v. Building Service Employees Union*, 197 Wash. 242, 84 P. (2d) 1021; *Bloedel Donovan Lbr. Mills v. International Woodworkers*, 4 Wn. (2d) 62, 102 P. (2d) 270.

With this understanding of the meaning, scope, and limitations of "peaceful picketing", we may consider the facts in this case. Appellant operates two sawmill plants near Everett in Snohomish county. In 1937, a considerable number of its employees became members of one of respondent unions, the Lumber & Sawmill Workers Union, Local No. 2653 (A. F. of L.). A working agreement was entered into by and between that union and appellant. Thereafter, on April 15, 1939, the union itself terminated the agreement, assigning as the reason, expressed in its letter of that date, "pressure from within our organization and the men in the plant refusing to join the organization." Apparently, at that time a number of appellant's employees were affiliated with Local 101, International Woodworkers of America (C. I. O.), which is a rival of respondent union.

In July, 1940, Local 101 had thirty-six members among appellant's employees. By September of that year, however, the number increased to more than six hundred. In October of the same year, appellant's employees, exclusive of office and supervisory assist-

ants, numbered approximately twelve hundred seventy-seven. Of these, over eight hundred had then become members of Local 101 (C. I. O.), and not more than twelve were members of respondent Local 2653 (A. F. of L.). Thus, the latter union then had not more than a one per cent representation among appellant's employees.

On October 29, 1940, respondents stationed pickets at the entrance of appellant's two sawmill plants and began picketing *en masse*. During the mornings, the number of pickets thus maintained ranged from five hundred to six hundred men. At other times, a smaller group was stationed in front of the mills, but always in sufficient numbers to constitute mass picketing and to prevent employees and other persons from entering the plants.

Appellant's manager on seeking admission to one of the plants was stopped and was told that, before he could enter he would have to get a permit from the business agent of the District Council of Lumber & Sawmill Workers at the Everett labor temple. The foreman of one of the mills was prevented from entering the plant at a time when there were six hundred pickets present; he saw two of the men take clubs out of a nearby automobile. Appellant's manager entered the plant while it was being picketed by about five hundred men, but was first stopped and was told: "We aren't letting anybody go through." Appellant's personnel officer made an attempt to enter one of the plants, when the business agent above referred to, standing in front of the line of pickets, said to him: "Well, Mr. Nicholson, we are running things now." Appellant's attorney sought admission to the plant on one occasion but was stopped by the pickets and was informed that he could not enter unless he had a union card; however, with the permission of the pickets he

was permitted to drive his car a few feet forward, turn around, and go away. One of the appellant's salesmen desired to visit the plant. His testimony as to what occurred was as follows:

"I drove down along the public street to where it turns off to go down into the Mill; a half dozen men stepped out in front of my car and one man said, 'where in hell do you think your going?' I said, 'I am going down to the Mill' and he said, 'That is what you think, you are not.' I said, 'What is this, a picket line, a blockade?' and he said, 'You can take it for what you like, you are not going in.' I said, 'I worked for this Company for 35 years, I helped to build these Mills and I feel some injustice is being done in not leaving me in it.' and he said, 'You can go to the Labor Temple.' He reached in my side window and grabbed my wheel and said, 'If you attempt to go in you will go down that bank.' In the meantime they were spreading cord wood in front of my car and I saw it was no use and started to turn around and they said, 'You back up.' I telephoned the office and that was the first time I knew that there was no one in the office. Saturday was the first day I had a notion to go in."

The result of these tactics, which continued over a period of a week, was that the mills closed down and remained closed until after the hearing on appellant's application for a temporary injunction.

Was this "peaceful picketing?" Was this an attempt to *persuade* by argument, reason, entreaty, or appeal, with the view of convincing the listener or observer of the righteousness or rightness of a cause, and of winning his sympathy and his legitimate active support? A partial answer at least is found in the opening paragraph of respondent's brief:

"During the trial of the case, we stated very clearly that the acts of misconduct on the part of the pickets, including any conduct which in fact or by threat prevented any officer, employee or customer or any other person from entering the premises, and the permit sys-

tem of gaining ingress to the plant, were wrong and that immediate steps would be taken to prevent their recurrence. We also stated during the proceedings that we had no objection to an injunction inhibiting these acts, and the orders on these subjects are very largely our own drafts. The testimony showed that several Everett sawmills were shut-down for a portion of the time, and that these employees, including others from Snoqualmie and Tacoma were there picketing."

The trial court, in its oral ruling given at the conclusion of the preliminary hearing, correctly gauged the situation and accurately defined the scope of "peaceful picketing," as follows:

"The Court is clearly of the opinion that this picketing has been unlawful. The presence of any number of men on a picket line [meaning, I think, an aggregation in excess of the number reasonably necessary in order to disseminate permissible information], if they did nothing in the world, is of itself not peaceful. Its purpose and effect is to intimidate those who want to go to work. As I say, it can't have any other purpose and can't have any other effect. So, clearly, if the evidence shows that five or six hundred or even one hundred pickets did nothing at all by way of molesting anybody, I think very clearly such picketing would have to be enjoined. This is for the fundamental reason that picketing is lawful for the dissemination of information by placards and the handing out of bandbills and I presume by word of mouth if other persons desire to talk to the pickets. But in addition to the number of pickets that are congregated there they indulge in conduct that is clearly unlawful. Now from the evidence it is quite clear that a policy has been maintained out there that only those who had received cards with the sanction of the union are permitted to enter. Regardless of other facts it is the opinion of this Court that such conduct is unlawful; it is not peaceable and constitutes intimidation. The constitutional and legal right of a labor union to tell the public that the products of that employer are unfair to labor, that their wages are too small or even that they should join a certain union of course is

circumscribed by the constitutional right of the fellow who wants to go in there."

It is true that the trial court entered a temporary decree and also a final decree, each enjoining respondent from picketing appellant's premises in any other manner than by maintaining not more than five pickets at the main entrance of the plants, in a peaceable and orderly manner, to advise the public or persons entering the premises of the existence of a labor dispute at the mills and the facts concerning it, and further enjoining them from molesting, hindering, obstructing, or interfering with any persons, whether employees, customers, or others, seeking to enter or leave appellant's premises. But, despite the fact that the court did set some limitations upon allowable activities, nevertheless, under the circumstances shown by this record, as already set forth herein, I do not believe that the injunction went far enough. I am of the opinion that, under the conditions described above, the decrees should have enjoined all picketing whatsoever of the premises by respondents. My reason for this conclusion is not that "peaceful picketing" in its proper sense is enjoinable, but rather because the acts of respondents did not constitute, or include any semblance of, "peaceful picketing" at all. Their conduct was made up of threats, force, and intimidation pure and simple. The only reason that it did not mount to actual violence and serious injuries was merely because those who endeavored to enter the premises believed that the picketers were "men of their word" and would mete out punishment instantly if their orders were not at once obeyed. No average man, single-handed and alone, would tempt further "persuasion" of that character, nor entertain the slightest doubt as to the finality of the "argument." Any lingering desire to be further edified on a matter of possible "public interest" would be

wholly submerged in an obsession to get elsewhere as quickly as possible.

Respondents' purpose was not to inform the public of the merits of their cause, nor to induce others, by persuasion, to join their ranks; on the contrary, their purpose was to stop all operation of the plants and to prevent all ingress to them. It was an unlawful undertaking from its beginning, and should have been enjoined in its entirety. There was no occasion to decide at that time what respondents might have been allowed to do had they proceeded lawfully or what they should be allowed to do under a different atmosphere. They themselves had created the emergency, and the only adequate remedy, in my opinion, was to enter an injunctive order which would have the effect of restoring as nearly as possible the situation existing before the trouble occurred. When that situation shall have been fully attained, when the impact of recent events upon appellant's business, its employees, and customers shall have disappeared, when normal conditions shall have been with some degree of certainty reestablished, then will be the time for respondents to proceed lawfully in the manner in which they are entitled to act, in an endeavor to publicize their grievances and to gain whatever advantage and support their claims may merit. But to permit them to inaugurate a campaign inspired by intimidation, threats, and violence, followed by a belated apology for excessive misconduct and a promise of better behavior in the future, which is, however, accompanied by a demand or request that they be thenceforward allowed to prosecute their initial purpose in a manner that would have been originally permissible to them, is simply to sanction a routine method through which similar situations will be created by others in the future. The best evidence of repentance for wrongs done is to make amends for the past, and

the most effective way to forestall the recurrence of a disturbance on the part of one intent on fomenting it, is to remove him, temporarily at least, from the scene of the conflict.

I am well aware that within the last five years, and particularly within the last two years, the right of "peaceful picketing" has been declared to have its roots in the first and fourteenth amendments to the Federal constitution, guaranteeing and protecting the right of freedom of speech, or freedom of discussion. *Senn v. Tile Layers Protective Union,* 301 U. S. 468, 81 L. Ed. 1229, 57 S. Ct. 857; *Thornhill v. Alabama,* 310 U. S. 88, 84 L. Ed. 1093, 60 S. Ct. 736; *Carlson v. California,* 310 U. S. 106, 84 L. Ed. 1104, 60 S. Ct. 746; *Milk Wagon Drivers Union v. Meadowmoor Dairies,* 312 U. S. 287, 85 L. Ed. 836, 61 S. Ct. 552, 132 A. L. R. 1200; *American Federation of Labor v. Swing,* 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568.

Those cases have caused considerable discussion, and I have no doubt will continue to do so for some time to come. I also believe that the supreme court of the United States will have further occasion to expound the doctrine of those cases as future situations clamor for decision. But, regardless of my own views with respect to the interpretation which the court of last resort has recently given to "peaceful picketing," I find nothing in those cases which compels a result different from my conclusions stated above. To the contrary, I discover in them much to support the disposition which I have suggested. Let us examine those decisions.

In the *Senn* case, *supra,* the United States supreme court was called upon to decide whether the due process clause and the equal protection clause of the fourteenth amendment were violated by a provision

of the Wisconsin labor code which legalized acts or conduct

"Giving publicity to and obtaining or communicating information regarding the existence of, or the facts involved in, any dispute, whether by advertising, speaking, patrolling any public street or place where any person or persons may lawfully be, *without intimidation or coercion, or by any other method not involving fraud, violence, breach of the peace, or threat thereof."* (Italics mine.)

and which also legalized peaceful picketing or patrolling, whether engaged in singly or in numbers, and prohibited any court from issuing any restraining order or injunction against any of such acts.

The supreme court, after reciting the facts in the particular case, specifically stated:

"The sole purpose of the picketing was to acquaint the public with the facts and, by gaining its support, to induce Senn to unionize his shop. There was no effort to induce Senn to do an unlawful thing. *There was no violence, no force was applied; no molestation or interference, no coercion. There was only the persuasion incident to publicity."* (Italics mine.)

As if to emphasize the peaceful character of the acts permitted, the court distinguished the case from the decision in *Truax v. Corrigan, supra,* saying that the conduct enjoined in the *Truax* case was

" . . . not simply peaceful picketing, not 'lawful persuasion or inducing,' not 'a mere appeal to the sympathetic aid of would-be customers by a simple statement of the fact of the strike and a request to withhold patronage,' "

but "consisted," among other things, of "threats and intimidation directed against customers and employees." If the Wisconsin statute had legalized acts of the kind shown in this record, the supreme court of the United States would have had a different ques-

tion to answer, and I think its answer would likewise have been different.

*Thornhill v. Alabama, supra,* was the first of the more recent cases. In that case, petitioner Thornhill had been convicted of a violation of a statute which made it unlawful for any person, without just cause or legal excuse, to go near to or loiter about any place of lawful business, for the purpose, or with the intention of *influencing or inducing other persons not to buy* from, deal with, or be employed at, such place of business, or to picket a place of lawful business for the purpose of impeding, interfering with, or injuring such business. The judgment of conviction was reversed by the United States supreme court on the ground that the statute was unconstitutional in that it abridged freedom of speech as secured by the first and fourteenth amendments.

Stressing the thought that freedom of speech and of the press were fundamental rights and liberties essential to free government, and emphasizing the necessity of assiduously guarding against their abridgement, the *supreme court* said:

"It is imperative that, when the effective exercise of these rights is claimed to be abridged, the courts should 'weigh the circumstances' and 'appraise the substantiality of the reasons advanced' in support of the challenged regulations."

The vice of the Alabama statute was, as the United States supreme court pointed out, that it had been construed and applied by the state court

"   .   .   .   so as to prohibit a single individual from walking slowly and peacefully back and forth on the public sidewalk in front of the premises of an employer, without speaking to anyone, carrying a sign or placard on a staff above his head stating only the fact that the employer *did not employ* union men affiliated with the American Federation of Labor; the purpose of the described activity was *concededly* to advise customers

and prospective customers of the relationship existing between the employer and its employees and thereby to induce such customers not to patronize the employer. *O'Rourke v. Birmingham,* 27 Ala. App. 133, 168 So. 206, cert. denied, 232 Ala. 355, 168 So. 209. The statute as thus authoritatively construed and applied leaves room for no exceptions based upon either *the number of persons engaged in the proscribed activity, the peaceful character of their demeanor, the nature of their dispute with an employer, or the restrained character and the accurateness of the terminology used in notifying the public of the facts of the dispute."* (Italics mine.)

It is not at all surprising that a statute so phrased and so construed, should be held unconstitutional. But the language just quoted does not describe the situation presented in this case.

Near the end of the *Thornhill* opinion, we find this illuminating statement, which may be considered in connection with the facts presented in the case at bar:

"The power and the duty of the State to take adequate steps to preserve the peace and to protect the privacy, the lives and the property of its residents cannot be doubted. But no clear and present danger of destruction of life or property, or invasion of the right of privacy, or breach of the peace can be thought to be inherent in the activities of every person who approaches the premises of an employer and publicizes the facts of a labor dispute involving the latter. We are not now concerned with picketing *en masse* or otherwise conducted which might occasion such imminent and aggravated danger to these interests as to justify a statute narrowly drawn to cover the precise situation giving rise to the danger."

In the case at bar we have "a precise situation" giving rise to "imminent and aggravated danger," and, further, no statute restricting the right of peaceful persuasion is here involved.

The companion case of *Carlson v. California, supra,* was the counterpart of the *Thornhill* case, and involved

a conviction for violation of an ordinance similar in its prohibitions to the Alabama statute. There had been no molestation, interference, threat, intimidation, or coercion. The decision was based squarely upon the *Thornhill* case, and therefore needs no further explication here.

We come next to the case of *Milk Wagon Drivers Union v. Meadowmoor Dairies, supra.* Of all the cases hereinbefore cited, this one approaches the nearest to the case at bar, and I am constrained to believe that it is direct authority for enjoining all picketing in the instant situation. The *Meadowmoor* case is in line with all of the others in that it, too, upholds the doctrine that "peaceful picketing" is a species of speech and is protected by the first and fourteenth amendments, but the majority opinion squarely holds that the right loses its protection when its exercise becomes enmeshed with violence. The entire opinion might well be quoted, but space forbids. I will, however, quote at some length those portions which I think bear directly upon the problem before us and justify the issuance of an absolute and unqualified injunction herein.

The supreme court of the United States said:

"The question which thus emerges is whether a state can choose to authorize its courts to enjoin acts of picketing in themselves peaceful when they are enmeshed with contemporaneously violent conduct which is concededly outlawed. . . . Such a decree [of injunction by a state court], arising out of a particular controversy and adjusted to it, raises totally different constitutional problems from those that would be presented by an abstract statute with an overhanging and undefined threat to free utterance [as in the *Thornhill* and *Carlson* cases, *supra*]. To assimilate the two is to deny to the states their historic freedom to deal with controversies through the con-

creteness of individual litigation rather than through the abstractions of a general law. [p. 292] . . .

"Peaceful picketing is the workingman's means of communication.

"It must never be forgotten, however, that the Bill of Rights was the child of the Enlightenment. Back of the guarantee of free speech lay faith in the power of an *appeal to reason by all the peaceful means for gaining access to the mind.* It was in order to avert force and explosions due to restrictions upon *rational modes of communication* that the guarantee of free speech was given a generous scope. *But utterance in a context of violence can lose its significance as an appeal to reason and become part of an instrument of force. Such utterance was not meant to be sheltered by the Constitution.* [p. 293]

"The place to resolve conflicts in the testimony and in its interpretation was in the Illinois courts [where the case arose] and not here. To substitute our judgment for that of the state court is to transcend the limits of our authority. And to do so in the name of the Fourteenth Amendment in a matter peculiarly touching the local policy of a state regarding violence tends to discredit the great immunities of the Bill of Rights. No one will doubt that Illinois can protect its storekeepers from being coerced by fear of window-smashings or burnings or bombings. And acts which in isolation are peaceful may be part of a coercive thrust when entangled with acts of violence. *The picketing in this case was set in a background of violence. In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future picketing might be wholly peaceful.* [p. 294]

"The Fourteenth Amendment still leaves the state ample discretion in dealing with manifestations of force in the settlement of industrial conflicts. . . . A state may withdraw the injunction from labor controversies but no less certainly the Fourteenth Amendment does not make unconstitutional the use of the injunction as a means of restricting violence. *We find nothing in the Fourteenth Amendment that prevents a state if it so chooses from placing confidence in a*

*chancellor's decree and compels it to rely exclusively on a policeman's club.* [p. 295]

"It is therefore relevant to remind that the power to deny what otherwise would be lawful picketing derives from the power of the states to prevent future coercion. . . . [p. 296]

"We do not qualify the *Thornhill* and *Carlson* decisions. We reaffirm them. They involved statutes *baldly forbidding all picketing* near an employer's place of business. Entanglement with violence was expressly out of those cases. The statutes had to be dealt with on their face, and *therefore* we struck them down. . . . We would not strike down a statute which authorized the courts of Illinois' to prohibit picketing when they should find that violence had given to the picketing a coercive effect whereby it would operate destructively as force and intimidation. [p. 297]

"Nor ought state action be held unconstitutional by interpreting the law of the state as though, to use a phrase of Mr. Justice Holmes, one were fired with a zeal to pervert. If an appropriate injunction were put to abnormal uses in its enforcement, so that encroachments were made on free discussion outside the limits of violence, as for instance discussion through newspapers or on the radio, the doors of this Court are always open. [p. 298]

"A final word. Freedom of speech and freedom of the press cannot be too often invoked as basic to our scheme of society. But these liberties will not be advanced or even maintained by denying to the states with all their resources, including the instrumentality of their courts, the power to deal with coercion due to extensive violence. [p. 299]" (Italics mine.)

I can readily subscribe to every statement made in the foregoing quotations if they be realistically applied. And I am morally certain that, if the sentiments therein expressed were accepted and followed by those engaged in labor disputes, there would be no occasion for the issuance of an injunction, or even for the application for one. Once it is known and fully understood

that picketing entails no violence, threats, or intimidation, at that very moment will picketing cease to induce the fear that is now so prevalent, and the public and those concerned in a labor dispute will accept picketing for what it should be, "a means of communication" for "gaining access to the mind."

The last of the cited cases is that of *American Federation of Labor v. Swing, supra.* That case presented to the United States supreme court, as stated in its opinion, simply

"  .  .  .  an instance of 'peaceful persuasion' disentangled from violence and free from 'picketing *en masse* or otherwise conducted' so as to occasion 'imminent and aggravated danger' . ... "

It was therefore held, in accordance with the prior decisions, that a decree enjoining *all* picketing, whether peaceful or otherwise, constituted a ban on free communication and was inconsistent with the guarantee of freedom of speech. That case has no application here.

In the light of the position taken by the United States supreme court on such matters generally, I am of the opinion that the injunction herein should have been made complete and absolute.

There remains to be considered the second branch of the majority opinion, wherein it is held that, even though appellant has entered into a working agreement with the bargaining agency (International Woodworkers of America—C. I. O.) chosen by a majority of its employees, nevertheless, until the bargaining agency so selected has been certified by the National Labor Relations Board, respondents may still continue to picket appellant's premises. It is apparently conceded by the majority that, after a bargaining agency has been certified by the National Labor Relations Board, the minority union is bound thereby and may

be enjoined from picketing the employer. The result in the case at bar is thus made to rest upon the fact that the bargaining agency in this instance had not yet been officially determined by the National Labor Relations Board. A number of Federal court cases are cited in support of the majority's conclusion, and I concede that they do so hold. None of those decisions, however, are by the United States supreme court, and we are therefore not bound by them. Until the supreme court affirms the principle of those decisions, I am not inclined to follow them, under a state of facts such as we have here.

Appellant's employees by an overwhelming majority selected their bargaining agency. The number of its employees who are members of respondent Local No. 2653 is negligible. Appellant entered into a working agreement with the bargaining agency, and except for the less than one per cent who belong to Local No. 2653, all its employees are satisfied with that agreement and desire to work under it. They were prevented from so doing by the acts of respondents. If appellant should bargain with the respondent minority union in order to put an end to picketing, it would find itself immediately embroiled in an even more serious dispute with the majority union. Furthermore, if appellant should enter upon negotiations with the respondent minority union, the majority union could charge it with unfair labor practice under § 8 (5) of the national labor relations act, despite the fact that the majority union, so far as the record shows, has not yet been formally certified as the bargaining agent for appellant's employees. *National Labor Relations Board v. Louisville Refining Co.,* (C. C. A. 6th), 102 F. (2d) 678; *National Labor Relations Board v. Piqua Munising Wood Products Co.,* (C. C. A. 6th), 109 F. (2d) 552; *National Labor Relations Board v.*

*Dahlstrom Metallic Door Co.,* (C. C. A. 2nd), 112 F. (2d) 756.

The net result would be that, in any event, appellant would find itself in a perpetual state of siege, first by pickets of one union and then by pickets of the other, all exercising their right of "freedom of speech" until appellant was ruined and all its employees, of both unions, were thrown out of work.

That is not all. The principle upon which the majority relies would not settle the matter, for under §§ 13 and 9(a) of the national labor relations act (29 U. S. C. A. (Sup.), §§ 163, 159a) a minority union and its members may still strike and bargain for themselves even after the majority union has been certified as the bargaining agency. Therefore, if "peaceful picketing" is a form of speech, the freedom of which is secured by the constitution, the members of the respondent minority union must likewise be permitted to continue picketing appellant's premises, even though the majority union may have by then been certified as the bargaining agency.

It is all very well for a court to dismiss the matter with a wave of the hand by saying that it is a subject for Congress to consider. But what about the employer? What about the vast majority of employees who desire to work under a valid agreement with their employer? What about the interests of the public? We are here faced with grim realities. "Judges need not be so innocent of the actualities of such an industrial conflict as this record [in this, *i. e.,* the *Meadowmoor* case] discloses" as to be unable to find a remedy for a situation that demands immediate and effective action. The injunction should, in my opinion, have been made complete and absolute upon the second branch of the case as well as upon the first.

I dissent.

ROBINSON, C. J. (concurring in the result)—I concur in the result of Judge Blake's opinion for the same reason that I concurred in the result of the majority opinion in *O'Neil v. Building Service Employees Union,* 9 Wn. (2d) 507, 115 P. (2d) 662, and of the majority opinion in *S and W Fine Foods, Inc. v. Retail Delivery Drivers and Salesmen's Union,* ante p. 262, 118 P. (2d) 962. In cases of this character, we are in duty bound to follow the decisions of the supreme court of the United States.

Upon oral argument, appellant contended that, even so, that duty can be properly discharged in the instant case by reversing the lower court upon the rule announced by the supreme court in its opinion in *Milk Wagon Drivers Union v. Meadowmoor Dairies,* 312 U. S. 287, 85 L. Ed. 386, 61 S. Ct. 552, 132 A. L. R. 1200. Briefly stated, the rule of that case is that picketing may be enjoined when set in "a background of violence." It must be conceded that there was some violence shown in the instant case. At the outset at least, there was mass picketing. Appellant's manager, its attorney, and one of its foremen were on separate occasions denied entrance to the plant. On another occasion, a picket grabbed the steering wheel of the automobile of a company salesman who was about to drive into the plant and threatened that, if he persisted, his car would be run over the bank. The violence, however, was sporadic and quite insignificant in nature, as contrasted with the violence which caused the majority of the members of the supreme court of the United States to leave the Illinois injunction in force in the *Meadowmoor* case:

"Witnesses testified to more than fifty instances of window smashing; explosive bombs caused substantial injury to the plants of Meadowmoor and another dairy using the vendor system and to five stores; stench

bombs were dropped in five stores; three trucks of vendors were wrecked, seriously injuring one driver, and another was driven into a river; a store was set on fire and in large measure ruined; two trucks of vendors were burned; a storekeeper and a truck driver were severely beaten; workers at a dairy which, like Meadowmoor, used the vendor system were held with guns and severely beaten about the head while being told 'to join the union'; carloads of men followed vendors' trucks, threatened the drivers, and in one instance shot at the truck and driver. In more than a dozen of these occurrences, involving window-smashing, bombings, burnings, the wrecking of trucks, shootings, and beatings, there was testimony to identify the wrongdoers as union men." (*Milk Wagon Drivers Union v. Meadowmoor Dairies, supra.*)

The author of the opinion in that case could well say: "These acts of violence are neither episodic nor isolated," and, "the picketing in this case was set in a background of violence."

It must be remembered also that, in spite of the veritable reign of terror staged by the pickets in conducting the strike involved in the *Meadowmoor* case, three of the judges held that the state court's injunction prohibiting picketing should, nevertheless, be completely dissolved. The long dissenting opinion of Mr. Justice Black, in which one of his brethren concurred, closes with the following sentence:

"I am of opinion that the court's injunction strikes directly at the heart of our government, and that deprivation of these essential liberties cannot be reconciled with the rights guaranteed to the people of this Nation by their Constitution."

A third justice devoted a separate dissenting opinion to establishing the proposition that the right to picket at a future time cannot be lost or impaired by past violence. Nor was his thesis far removed from

the thought of the majority, for they included in their own opinion the following statement:

"The injunction which we sustain is 'permanent' only for the temporary period for which it may last. *It is justified* only by the violence that induced it and *only so long, as it counteracts a continuing intimidation.*" (Italics mine.)

Since the violence in this case at no time approximated, or even approached, that shown in the *Meadowmoor* case, I am of the opinion that that case is not authority for the issuance of the injunction for which the appellant prays. Indeed, since the majority opinion in the *Meadowmoor* case squarely holds that an injunction is justified "only so long as it counteracts a continuing intimidation," and the lower court in the instant case found, as a fact, that violence and intimidation had wholly ceased, I believe the supreme court of the United States would sustain the trial court had it refused to keep any injunction whatever in force.

In fact, there is much reason to think that, should the matter come before it, the supreme court would dissolve even the comparatively mild injunction which the trial court's order left in effect. It expressly forbids picketing by more than five pickets. Would not the supreme court be compelled to dissolve it in order to maintain the integrity of its recent decisions? Those decisions reach the conclusion that peaceful picketing cannot be restrained, upon the reasoning that each picket is doing nothing more than exercising his individual and personal right of freedom of speech as guaranteed him by the first amendment to the Federal constitution; hence, no injunction will lie. The picket line in this instance was a long one, at times, as Judge Blake's opinion points out, containing as many as three hundred men. An injunction forbidding all but five of the three hundred from picketing denies that right

to all but five. Under the doctrine of the *Swing* and companion cases, would not the court be compelled to hold that the injunction limiting the picket line to five men deprived each of the several hundred others of their respective constitutional rights of freedom of speech? Obviously, this question cannot be answered by saying that a court can compel them to delegate such rights. A right more personal in its nature than the right of freedom of speech cannot be conceived or imagined. To compel a man, by court order, to delegate that right to another or others, would be simply to deprive him of it by force.

To say, as the supreme court has recently repeatedly said, that peaceful picketing by persons having a legitimate interest in a labor dispute cannot be restrained because no man's right to freedom of speech may be abridged, is just another way of saying that every man having a legitimate interest in a labor controversy may peacefully picket without restraint. How, then, could that court sustain an injunction limiting the number of pickets?

As I view it, the second question discussed in both of the foregoing opinions is purely academic. I can see no good reason to inquire whether or not Congress intended to prohibit peaceful picketing after a collective bargain had been made, for it could not constitutionally do so. This proposition (assuming the *Swing* case to be sound) is subject to demonstration, almost Euclidian in brevity and certainty:

(1) Peaceful picketing is nothing other than the exercise of that freedom of speech protected by the first amendment to the Federal constitution.

(2) To abridge peaceful picketing would, therefore, abridge freedom of speech.

(3) But the first amendment to the Federal constitution provides that:

"Congress shall make no law . . . abridging the freedom of speech, . . . "

Hence, if Congress did in fact attempt to limit peaceful picketing by any provision of the national labor relations act, the act is to that extent unconstitutional.

I concur in the result of the majority opinion.

JEFFERS, J., concurs with ROBINSON, C. J.

BEALS, J. (dissenting)—The picketing here sought to be enjoined was initiated by a group of several hundred pickets. As stated in the majority opinion, there was neither damage to property nor actual assault upon persons, but vehement threats of physical violence were made, which beyond question would have been carried out, save for the submission of the persons to whom they were addressed.

In my opinion, the situation disclosed by the record shows beyond question that the picketing of appellant's plant in its initiation was accompanied by such a show of force and such threats of physical violence as to deprive respondents of any standing before a court of equity. The constitutional right of free speech does not protect an individual or a group when threatening injuries to persons who are neither committing nor threatening to commit any unlawful act, but who are simply in a lawful manner attending to their own concerns.

In my opinion, the trial court should have enjoined all picketing of appellant's plant.

SIMPSON, J. (dissenting)—I am unable to agree with the majority in affirming the issuance of the injunction. Instead, I concur in the dissenting opinion of Judge Beals and in that portion of Judge Steinert's, holding that, because of the force and threats of violence, the picketing was not peaceful and thus illegal.

The only reason that people approaching the mill were not severely injured was that they retreated in

the face of threats which were well supported with means to enforce them. It is clear to me that the intimidation present in this case amounted to violence. Certainly, it is not necessary that property be destroyed or that individuals be injured or killed before courts hold that violence was present in any case.

The judgment should be reversed.

MILLARD, J. (concurring in the result)—I agree that it is the function of a court to declare what the law is, and not what its members as individuals think it ought to be; otherwise, we would have judicial anarchy. The difficult question is: What is the law today that is applicable to the facts in the case at bar?

In *St. Germain v. Bakery & Confectionery Workers' Union,* 97 Wash. 282, 166 Pac. 665, L. R. A. 1917F, 824 (decided July 17, 1917), we held, following *Jensen v. Cooks' & Waiters' Union,* 39 Wash. 531, 81 Pac. 1069, 4 L. R. A. (N. S.) 302 (decided August 8, 1905), that, where plaintiffs' restaurant was picketed by a labor union, the pickets wearing cards which declared the place unfair to union labor, and the only object was to compel plaintiffs to enter into a contract with the labor union to employ only members of the labor union, the same will be enjoined as an unlawful interference with plaintiffs' business, regardless of whether it was peaceful or otherwise. See, also, to the same effect, *Pacific Coast Coal Co. v. Dist. No. 10, U. M. W. A.,* 122 Wash. 423, 210 Pac. 953 (decided December 6, 1923).

In *Sterling Chain Theaters v. Central Labor Council,* 155 Wash. 217, 283 Pac. 1081 (decided January 10, 1930), we held that picketing one hundred feet from the place of business picketed was lawful. We gave no reason, satisfactory to me, why ninety-nine feet or ninety-eight feet would be unlawful, while the

extra foot or so would be the difference between lawful and unlawful picketing. This is in harmony with *Adams v. Local No. 400 of Cooks & Waiters,* 124 Wash. 564, 215 Pac. 19 (decided May 4, 1923).

In *Zaat v. Building Trades Council,* 172 Wash. 445, 20 P. (2d) 589 (decided April 4, 1933), we took a long stride. In that case we held that the rule of the labor unions that a proprietor of a plumbing business must not himself work in carrying out his own contract, although such proprietor is fully qualified to engage in such labor, was a question of policy which concerns only the unions and their members, and however oppressive such interference with appellant's business the union publicity that the proprietor was unfair to organized labor because he insisted on working as a plumber in carrying out his own contracts, no relief may be afforded by the courts.

In *Kimbel v. Lumber & Saw Mill Workers Union,* 189 Wash. 416, 65 P. (2d) 1066 (decided March 11, 1937)—another "picketing" case—we held that there is no justification for restraining the activities of a labor union in engaging in a peaceful strike and representing that an employer is unfair to organized labor when he did not pay the union rate of wages, where no attempt was made to molest or intimidate any employee or to do any damage to property.

In *Safeway Stores v. Retail Clerks' Union,* 184 Wash. 322, 51 P. (2d) 372 (decided November 8, 1935), *Adams v. Building Service Employees Union,* 197 Wash. 242, 84 P. (2d) 1021 (decided December 6, 1938), *Fornili v. Auto Mechanics,* 200 Wash. 283, 93 P. (2d) 422 (decided August 21, 1939), and *Shively v. Garage Employees Union,* 6 Wn. (2d) 560, 108 P. (2d) 354 (decided December 12, 1940), we held (contrary to statute, Rem. Rev. Stat. (Sup.) § 7612-1 [P. C. § 3467-21], defining a "labor dispute") that peaceful picketing of

the place of business of an employer by a union which does.not include in its membership any employee of such employer, for the purpose of persuading or coercing such employees to join a union against their will, is unlawful and may be enjoined. To the contrary is *Marvel Baking Co. v. Teamsters' Union*, 5 Wn. (2d) 346, 105 P. (2d) 46 (decided September 6, 1940).

In *Bloedel Donovan Lbr. Mills v. International Woodworkers*, 4 Wn. (2d) 62, 102 P. (2d) 270 (decided May 6, 1940), we held that, under the Wagner act (29 U. S. C. A. (Sup.) §§ 151 to 166), where interstate commerce is involved, the National Labor Relations Board has exclusive initial jurisdiction to determine the bargaining unit for employees; and where two rival unions submitted to the board the dispute as to which was the proper collective bargaining agency of the employees of a lumber company, and an election was held under the supervision of the board and the result duly certified, the minority union is bound thereby.

In *O'Neil v. Building Service Employees Union*, 9 Wn. (2d) 507, 115 P. (2d) 662 (decided July 24, 1941), we held that a labor union had right to picket peacefully apartment houses which proprietor operated alone and without employees, and to advertise by use of sandwich boards carried by pickets that proprietor was unfair to organized labor, for purpose of forcing proprietor, against her will, to join the union. This holding follows decision February 10, 1941, of United States supreme court in *American Federation of Labor v. Swing*, 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568, that the constitutional guaranty of freedom of discussion is infringed by judicial policy of a state to forbid resort to peaceful persuasion through picketing where there is no immediate employer-employee dispute, as in the case of attempted unionization of the business employing nonmembers of the union.

That case squarely presented the question whether the right to work and operate one's plant or business free from interference was as inviolate as the right to strike and peacefully picket a place of business regarded as unfair to the picketing union. The United States supreme court held that the right of labor unions to peacefully convey to the public at large, and to persons especially interested, information that a certain business has been by labor unions declared unfair, can not be enjoined, in view of the fourteenth amendment to the United States constitution, which guarantees freedom of speech; that the constitutional guaranty of freedom of discussion is infringed by the common law or statutory policy of a state forbidding resort to peaceful persuasion through picketing merely because there is no immediate labor dispute.

On the same day, the United States supreme court held in *Milk Wagon Drivers' Union v. Meadowmoor Daries,* 312 U. S. 287, 85 L. Ed. 836, 61 S. Ct. 552, 132 A. L. R. 1200, that an injunction against picketing is justified only by the violence that induced it and only so long as it counteracts a continuing intimidation.

Subsequent to our opinion in *O'Neil v. Business Service Employees Union, supra,* the United States supreme court, on authority of *American Federation of Labor v. Swing, supra,* in *Bakery & Pastry Drivers v. Wohl,* 313 U. S. 548, 85 L. Ed 1513, 61 S. Ct. 1108, reversed the New York court of appeals' affirmance of lower court's granting of injunction on facts which I quote, as follows, from the opinion of the New York supreme court (14 N. Y. S. (2d) 198) in the cause:

"Each of the two plaintiffs are peddlers engaged in the business of buying baked food products from different manufacturing bakers and reselling them to grocery stores. Each is the owner of a truck used by him in the distribution of his wares. One of the plaintiffs, Wohl, has been a peddler for five years and the

other, Platzman, for two years. Wohl buys his merchandise from four different bakeries and Platzman from two. Neither one has any contractual relation with any of these bakeries. The earnings of the plaintiffs are based upon the difference between the purchase and the resale price of the products. The approximate income of Wohl is about $32 weekly from which he ·supports his mother and two motherless daughters. He works about thirty-three hours a week and has no employee.

"Platzman also has no assistant, is married and an expectant father and his income is about $35 weekly, derived from a working schedule of sixty-five hours.

"These plaintiffs seek a permanent injunction restraining the defendant union from picketing the places of business of the manufacturing bakers who sell to them and of the customers who buy from them. The proof is that the defendant threatens to picket these manufacturers and the various customers of the plaintiffs unless each of the plaintiffs employ a member of the defendant union one day a week to assist them. The place of business of the Diamond Baking Company, one of the manufacturers selling to the plaintiffs, has already been picketed. Another manufacturer was also picketed for a short period.

"The plaintiffs contend that they are engaged in an independent calling and that their meagre earnings are insufficient to permit them in justice to their families to employ a union member for one day a week."

This is another jurisdictional fight between labor unions. The picketing union is the minority union. Dissatisfied with the selection of another union by a majority of the employees as the collective bargaining agency—there has been no certification by the National Labor Relations Board of the selection—the minority union commenced picketing en masse of appellant's mills and by threats of violence prevented employees, who were willing to work, from entering the mills. Since commencement of this action, the violence and threats were discontinued.

Society is in such a state of transition that conduct that would have been a crime three decades ago is tolerated, in fact, approved at the present time. Less than a quarter of a century ago, the courts uniformly held that "picketing" was unlawful—that there could not be such a thing as "peaceful picketing." Later, some courts held that picketing was lawful if done within a specified radius from the place picketed. Subsequently we held (contrary to a statute) that "peaceful" picketing of the place of business of an employer by a union, which did not include in its membership any employees of such employer, for the purpose of coercing such employees to join a union against their will, is unlawful. Thereafter, we held that a *minority union, after election* by employees *and certification* by National Labor Relations Board of another union as the bargaining agency, *could not lawfully picket* the employer's place of business.

The decisions which denied or endeavored to regulate the right to picket were invalidated by the United States supreme court in its "freedom of speech" opinion (*American Federation of Labor v. Swing, supra*). The United States supreme court's holding that, unless the picketing was peaceful, the courts could enjoin the picketing, was vitiated by its opinion that, if in the beginning the picketing was not peaceful but when influenced by threat of injunction the picketing became peaceful, such picketing is lawful.

What will the attitude of the United States supreme court and other courts be in cases of peaceful picketing of manufactories and plants devoted to national defense projects? Can such picketing be peaceful? Or, can peaceful picketing which halts or retards the national defense program be lawful?

If, as held by the United States supreme court, the right to peacefully picket privately owned plants and

places of business, whether devoted to national defense projects or otherwise, is inviolate under the fourteenth amendment to the United States constitution, can the right be denied to picket plants operated by the United States government? An answering argument on both phases of this question, by analogy at least, is that, while the constitutional (Art. 1, § 22, state constitution) right of the defendant in criminal prosecutions to appeal from conviction is inviolate, yet that constitutional right is subject to regulation, and failure to observe the rules of practice and procedure may result in dismissal of his appeal and a denial of a hearing on the merits.

The American Federation of Labor pledged, at its sixty-first annual convention in Seattle in October, 1941, its willingness to do every thing within the power of its members to support our government in this time of real, not fancied, crisis. The leaders of that federation declared that they were not aware of any controversy in any of the defense industries that could not be settled through negotiation and mediation while the men remained at work producing those things which are essential to the welfare of our country; that they could not conceive of any jurisdictional dispute that could not be settled amicably while the men are at work. The editor of the Washington State Labor News, issue of October 31, 1941, commented as follows:

"We were and are opposed to any attempts of governmental regulation of the affairs of trade unions. The trade unions, however are charged with a grave responsibility to keep the wheels of industry going, and it is becoming more and more necessary for these unions to invoke discipline in the organizations so as to prevent any attempt of governmental regulation. When a house is on fire it becomes ridiculous to let the house burn while the jurisdictional or wage dispute is taking place—and the world is certainly on fire today."

The Congress and the president of the United States, reacting to public opinion, are now preparing anti-strike legislation which would empower the government to take over a defense plant when strikes impede production. Doubtless, the enactment would provide for the following procedure: Successive steps of collective bargaining under present laws, conciliation, mediation, and a fourth step of compulsory arbitration. It may be that the Congress and the president, if the emergency warrants and public opinion becomes more insistent in its demand, will attempt by statute that governmental regulation of its affairs to which labor unions are opposed. If the nation's life is then in grave peril—as it may be—the United States supreme court will hardly strike down that legislation as unconstitutional. However, until that time, though the conduct of respondents is violative of the spirit of the Wagner act, I am just as sure that the supreme court of the United States will follow its "freedom of speech" opinion (*American Federation of Labor v. Swing, supra*); hence, I am compelled to concur in the result.