[No. 28421. *En Banc.* July 24, 1941.]

MAGGIE O'NEIL, *Appellant,* v. THE BUILDING SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL No. 6, *et al., Respondents.*[1]

*John W. Whitham,* for appellant.
*Stevenson & Gershon,* for respondents.

MILLARD, J.—Plaintiff, who is the owner of two apartment houses in the city of Seattle, brought this action to enjoin Building Service Employees International Union, Local No. 6, and its president, secretary, and business agent, from picketing plaintiff's apartment houses, or using any coercive measures whatsoever, with the intent to compel plaintiff to recognize and join

[1]Reported in 115 P. (2d) 662.

defendant union. The appeal is from the judgment of dismissal, rendered upon the plaintiff's refusal to plead further after a demurrer had been sustained to her complaint.

The complaint alleges that appellant, who is a widow and has several adult children who are capable of assisting her in the management of two apartment houses owned by her in the city of Seattle, was informed by a walking delegate or representative of respondents that, unless she joined respondent labor union, respondents would declare a boycott against the appellant and against the business of appellant. No person or persons is or are being hired in connection with the operation of the two apartment houses by appellant, who advised respondent union's representative that, as there was no controversy concerning employment of workmen or their wages, she would not comply with the demand. Appellant further alleged that

". . . in order to coerce plaintiff [appellant] to the subjection of her said business to the control of said union and the members thereof, the said defendants [respondents] did then and there enter into a combination, confederation and conspiracy for the purpose of coercing the plaintiff [appellant] to subject the control of her business and apartment houses to the said Building Service Employees International Union, Local No. 6, and said members thereof, and did . . . picket in front of said Aristo Apartment House and said . . . picket at all times threatened to intercept, interfere with, molest, contact and intimidate plaintiff's [appellant's] patrons and by the acts of picketing are unlawfully depriving the plaintiff [appellant] of a lucrative business."

The picket who patrols in front of the apartment houses bears a "sandwich" sign on the back and front of which is printed in large letters the following notice: "Aristo-Prospect Apartments Unfair to organized labor." The complaint further alleges that the

union and its members conspired among themselves and with other persons to impede the appellant in the conduct and transaction of her business and to interfere with her patrons or tenants by persuasion and intimidation and by mailing written communications to her tenants advising them to sever their tenancy with her. Appellant admits that she is unable to say how many patrons or tenants had been or will be intimidated by reason of the presence of the picket and the communications, but, on information and belief, she alleges that many of her tenants will be frightened, intimidated, and induced to sever their tenancy, and patrons will further be deterred from entering her apartment houses.

The allegations of fact, together with the reasonable inferences therefrom, in the complaint, are admitted by the demurrer to be true; that is, the demurrer admits the truth of all well pleaded facts, as well, also, as every legitimate inference deduced from such facts.

In *Matthews v. Oklahoma Pub. Co.*, 103 Okla. 40, 219 Pac. 947, cited by us with approval in *Puget Mill Co. v. Duecy*, 1 Wn. (2d) 421, 96 P. (2d) 571, the rule as to admissions by demurrer is well stated to the effect that a demurrer only admits the truth of the facts pleaded, but does not admit the truth of the inference of the pleader based on the facts pleaded unless the facts themselves are sufficient to authorize such inference.

The allegations that respondents entered into a conspiracy for the purpose of coercing appellant to subject the control of her business to the respondents, and threatened to intercept, interfere with, molest, contact, and intimidate appellant's patrons, as well as the allegations that respondent union conspired with other persons and interfered with appellant's tenants by

persuasion and intimidation, are mere conclusions of the pleader. There is no contention, neither is there any allegation, that the picketing was not peaceful. Peaceful picketing, under the authorities, is lawful, hence the fact that the effect of such picketing is to compel or coerce the one picketed to yield to the demands of the picketing union does not constitute intimidation or coercion in the sense of unlawful compulsion.

Summarized, the allegations of fact, admitted by the demurrer to be true, are that appellant is the proprietor of two apartment houses which she operates alone and without employees. Because of appellant's refusal to join respondent union, respondents are peacefully picketing appellant's apartment houses and advertising by use of sandwich boards that appellant is unfair to organized labor for the purpose of forcing appellant, against her will, to join respondent union.

The question presented is whether the fourteenth amendment to the United States constitution prevents the courts of this state from granting injunctive relief against a labor union and its members, to prohibit peaceful picketing of the place of business of a person who has no employees where the purpose of such picketing is to force, against her will, the owner of such business to join the picketing union.

In *Zaat v. Building Trades Council,* 172 Wash. 445, 20 P. (2d) 589; *Kimbel v. Lumber & Saw Mill Workers Union, etc.,* 189 Wash. 416, 65 P. (2d) 1066, and *Marvel Baking Co. v. Teamsters' Union, etc.,* 5 Wn. (2d) 346, 105 P. (2d) 46, we held that it is lawful for workmen to organize unions, and that it is lawful for labor unions to convey to the public at large, and to persons especially interested, information that a certain business has been by labor unions declared unfair; that is, to

conduct peaceful picketing at or near such place of business and to advise the public of the fact that the owner or operator of that business is regarded as unfair to the labor union.

In *Zaat v. Building Trades Council, supra,* a demurrer to the complaint in an action to enjoin defendants from advising the public that plaintiff was unfair to organized labor was sustained, and, on appeal, we affirmed the judgment dismissing the complaint. In that case, the plaintiff, who was the proprietor of a plumbing business, was denied the right to work in carrying out his own contract. The rule of the labor unions that a proprietor of a plumbing business must not himself work in carrying out his own contract, although such proprietor is fully qualified to engage in such labor, was, we held, a question of policy which concerns only the unions and their members; and, however oppressive such interference with appellant's business—the union publicity that the proprietor was unfair to organized labor because he insisted in working as a plumber in carrying out his own contracts—no relief may be afforded by the courts. We said:

"The rule laid down in some jurisdictions, to the effect that, because an employer may lawfully perform his own work or a portion thereof, and that, because the employer is within his legal rights in so doing, a labor union or members thereof can not lawfully engage in a controversy with him concerning his conduct, does not prevail in this state."

In *Shively v. Garage Employees Local Union No. 44,* 6 Wn. (2d) 560, 108 P. (2d) 354, we held, and reviewed therein our prior opinions to the same effect, that peaceful picketing of the place of business of an employer, by a union which does not include in its membership any employee of such employer, for the pur-

pose of persuading or coercing such employees to join a union against their will, is unlawful and may be enjoined.

The opinion in *Shively v. Garage Employees Local Union No. 44, supra,* was filed December 12, 1940. February 10, 1941, the United States supreme court, in *American Federation of Labor v. Swing,* 312 U. S. 321, 61 S. Ct. 568, held that the constitutional guaranty of freedom of discussion is infringed by judicial policy of a state to forbid resort to peaceful persuasion through picketing where there is no immediate employer-employee dispute as in the case of attempted unionization of the business employing nonmembers of the union. In other words, the United States supreme court held that the right of labor unions to peacefully convey to the public at large, and to persons especially interested, information that a certain business has been by labor unions declared unfair, cannot be enjoined in view of the fourteenth amendment to the United States constitution which guarantees freedom of speech; that the constitutional guaranty of freedom of discussion is infringed by the common law or statutory policy of a state forbidding resort to peaceful persuasion through picketing merely because there is no immediate labor dispute. That case presented the question, as does the case at bar, whether the right of freedom of speech is violated by an injunction restraining a labor union from peacefully picketing a place of business on the ground that such place of business is unfair to organized labor.

A proprietor of a business or an employer is within his legal rights in performing his own work or a portion thereof, but a labor union, by means of peaceful picketing and advising the public that such proprietor or employer is unfair to organized labor because he

exercises such legal rights, may coerce that proprietor or employer to forego that legal right to work. *Zaat v. Building Trades Council, supra.*

It is now lawful for a labor union to peacefully picket the place of business of an employer, none of whose employees is a member of the picketing union, for the purpose of coercing such employees, against their will, to join that union. *American Federation of Labor v. Swing, supra.* If a labor union has the legal right to picket, as unfair to organized labor, the place of business of an employer who refuses to compel his employees to join such union or to discharge them for refusal to become members of the picketing union, it logically follows that a labor union has the legal right to go a step farther and peacefully picket the place of business of a person who has no employees—one doing business as an individual proprietor—to compel, against his will, such lone person or individual proprietor to join the picketing union.

It may be argued that the right to work and operate one's factory, plant, or business free from interference, which should be as inviolate as the right to form labor unions, the right to peacefully strike, and the right to peacefully picket a place of business regarded as unfair to the labor union, is no longer protected.

The constitution of the United States is the supreme law of the land. However much we may disagree with the interpretation of that constitution by the United States supreme court, such interpretation is binding on us. The question involved in the case at bar is, it is true, of great public interest. That question is foreclosed by opinion of the supreme court of the United States in *American Federation of Labor v. Swing, supra.*

The respondents are charged with doing and threat-

ening to do only what, under the authorities, they have a legal right to do; therefore, those acts and threats are not unlawful.

The judgment is affirmed.

BLAKE, J., concurs.

BEALS and DRIVER, JJ., concur in the result.

ROBINSON, C. J. (concurring in the result)—While I concur in the result of the foregoing opinion, I desire to make it clear that I do not pretend to have arrived at that result through the employment of any kind of intellectual process. In fact, I agree with substantially everything that is said in the opinion of the dissenting judges, but I feel compelled to follow the opinions of the supreme court of the United States in the *Swing* case and in the other so-called "freedom of speech" cases recently decided by that court.

In informal discussions provoked by those decisions, I have more than once heard it stoutly contended, and in some instances by lawyers of recognized ability and standing, that a judge of an inferior court may, and indeed should, follow his own conscience and understanding in matters of constitutional interpretation. This is not the first time in our history that this theory has been advanced. In 1832, Andrew Jackson, believing that a decision of the supreme court of the United States in the celebrated case of *McCullough v. Maryland*, and subsequent decisions relating to the bank of the United States, were wholly dictated by purely political considerations, sent a message to Congress containing the following pointed suggestion:

"Each public officer who takes an oath to support the Constitution swears that he will support it as he understands it and not as it is understood by others." 2 Richardson, Messages and Papers of the Presidents, 576.

The *Dred Scott* case, decided in 1857, was considered a purely political decision by a great section of the people of that time. Members of the clergy of such standing as Henry Ward Beecher and George Barrel Cheever denounced it from their pulpits and counseled public disobedience. Horace Greeley said, editorially in the New York Tribune, that the opinion deserved no more respect than if made by "a majority of those congregated in any Washington barroom." Yet, Beveridge (from whose seventh chapter of Volume 2, Abraham Lincoln, the material for this paragraph is taken) says that no lawyer "not in politics" took that position. It may be added that one lawyer of that time, who was very much in politics and who disagreed with every line of the *Dred Scott* decision, said of the supreme court, in a speech delivered at Springfield, Illinois, on July 26, 1857:

"We think its decisions on constitutional questions, when fully settled, should control not only the particular cases decided, but the general policy of the country, subject to be disturbed only by amendments of the Constitution as provided in that instrument itself. More than this would be revolution. But we think the Dred Scott decision is erroneous. We know the court that made it has often overruled its own decisions, and we shall do what we can to have it overrule this." 2 Complete Works of Abraham Lincoln, Nicolay and Hay, 320.

The Jacksonian theory that every public officer may employ his own interpretation of the constitution in the discharge of his official duties, is clearly untenable. When applied to state judges, it is demonstrably so. At this term of court, in a case very similar to the case at bar, one of counsel, evidently sensing that the doctrine of the *Swing* case might prove unpalatable, forcefully reminded us that the constitution itself contains, in its sixth article, the following language:

516

"This constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; *and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.*" (Italics mine.)

It may be urged that, while it is thus declared that the judges of every state shall be bound by the constitution of the United States, there is no express declaration or requirement that they shall be bound by interpretations placed upon it by the supreme court. But this must follow by unescapable implication, otherwise the constitution could not, in any true sense, be the "supreme law of the land." To be so, it must obviously be applied, not with one meaning in the state of New York, another and different meaning in the state of Illinois, and still another in the state of Washington, but with the same meaning in every state of the union. That it must necessarily have but one official interpreter arises out of the very nature and purpose of the constitutional federated system, just as the power of the courts to declare an act of Congress unconstitutional and void, although nowhere expressly granted, arises, by similar implication, out of the circumstances that only by assuming its intended existence can the purpose of the founding fathers, to establish a national government with strictly limited powers, be given rational meaning.

In one of its recent "freedom of speech" decisions, the supreme court of the United States included the following statement in its opinion:

"Here again, the state courts have not the last say. They must act in subordination to the duty of this Court to enforce constitutional liberties even when denied through spurious findings of fact in a state court." *Milk Wagon Drivers Union v. Meadowmoor Dairies,* 312 U. S. 287, 298, 61 S. Ct. 552.

While the implication that state courts have been guilty of, or are at least likely to resort to, the making of spurious findings of fact in order to deny constitutional liberties, may well be questioned (and even resented), the statement is otherwise unquestionably sound. In such matters as those involved in this case, the supreme court of the United States *has* "the last say."

The dissenting judges believe that, giving the opinion in the *Swing* case the fullest faith and credit, it does not necessitate the result at which the majority have arrived. I think that it does, and, therefore, I can see no escape from the disagreeable duty of voting to affirm the judgment of the lower court. Nor can I see any escape from the consequences suggested in the opinion of the dissenting judges, unless the court which rendered the opinion in the *Swing* case shall overrule it, or modify it, or declare that it has been completely misunderstood.

STEINERT, J. (dissenting)—The substance of the majority opinion is contained in the following paragraph:

"It is now lawful for a labor union to peacefully picket the place of business of an employer, none of whose employees is a member of the picketing union, for the purpose of coercing such employees, against their will, to join that union. *American Federation of Labor v. Swing, supra* [312 U. S. 321, 61 S. Ct. 568]. If a labor union has the legal right to picket, as unfair to organized labor, the place of business of an employer who refuses to compel his employees to join such union or to discharge them for refusal to become members of the picketing union, it logically follows that a labor union has the legal right to go a step farther and peacefully picket the place of business of a person who has no employees—one doing business as an individual proprietor—to compel, against his will, such lone person or individual proprietor to join the picketing union."

In assimilating the full force and effect of that language, it is well to remember that it was held by this court, in *Zaat v. Building Trades Council,* 172 Wash. 445, 20 P. (2d) 589 (cited in the majority opinion), that a labor union had the right to publicize an individual proprietor of a business as being "unfair to organized labor" because such person refused to obey a rule adopted by the union forbidding any employer to perform any labor in connection with the conduct of his own business, even though such person were himself fully qualified to perform that labor.

By going "a step farther," as the majority opinion declares, a labor union may now picket the place of business of a person who has *no* employees, in order to compel such person, against his will, to join the picketing union.

So, then, under the present majority holding, coupled with our former decisions, we have this state of the law: A union has the legal right to picket any individual doing any kind of business, but employing no assistants, for the purpose of coercing such individual to join the union, and then, by the simple expedient of adopting a rule, similar to that in the *Zaat* case, *supra,* compel such individual to desist from conducting his own business unless he employs someone else to perform the labor which he was accustomed to perform. In other words, in order to operate his business, such person must himself remain idle. The lone shoe-cobbler, boot-black, watch-repairer, or seamstress will all be subject to the same discipline. Even the man and wife who together perform the labor incident to the business conducted by them will be vulnerable.

Employing the logic and formula used in the majority opinion, "it logically follows that a labor union has the legal right to go a step farther" and picket any-

one, man or woman, who as proprietor or owner performs any labor in connection with his own affairs, whether in business or in the home, unless such person joins the appropriate union and abides by a rule directed against self-help. No longer would a man be allowed to mow his own lawn, or his wife be permitted to cook the meals or wash the dishes. All that would have to be done by someone else.

If this state of affairs is the logical outcome of "freedom of speech," I would rather have the United States supreme court so interpret the constitution than to have a part in thus declaring the law. If that is to be the law, then I think that the time has arrived when we should have less speech, and more freedom.

I dissent.

MAIN, SIMPSON, and JEFFERS, JJ., concur with STEINERT, J.