[No. 30738. *En Banc.* June 2, 1949.]

A. E. HANKE *et al., Respondents,* v. INTERNATIONAL BROTHER-
HOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND
HELPERS UNION, LOCAL 309 *et al., Appellants.*[1]

*Bassett & Geisness,* for appellants.

*J. Will Jones, H. C. Vinton,* and *Clarence L. Gere,* for
respondents.

STEINERT, J.—This action was instituted by the plaintiffs
to enjoin the defendant union and its representatives from
further picketing the plaintiffs' business establishment and
to recover damages for the financial loss alleged to have
been sustained by the plaintiffs as the result of prior picket-
ing by the defendants.

[1]Reported in 207 P. (2d) 206.

On the basis of the allegations in the complaint, together with facts set forth in the supporting affidavit of one of the plaintiffs, the trial court immediately and without notice issued a restraining order and order to show cause, temporarily prohibiting the defendant union from interfering with, molesting, or injuring the plaintiffs' business by picketing or by any other means, and directing all of the defendants to show cause why a temporary injunction of the same prohibitory effect, *pendente lite,* should not issue.

The defendants seasonably appeared and filed a motion to dissolve the temporary restraining order, on the ground that the order previously issued by the court deprived the defendants of their right of freedom of speech as guaranteed by the first and fourteenth amendments to the constitution of the United States. Attached to and, by reference, made a part of the motion was the affidavit of the defendant business agent of the union, setting forth affirmatively the circumstances under which the picketing had been instituted and intimating the reasons why such activity on the part of the union should not be restrained.

Upon the hearing on the order to show cause and application for temporary injunction, oral testimony was taken covering all the issues in the case. At the conclusion of the evidence, followed by argument of counsel, the court took the matter under advisement and, thereafter, delivered its memorandum opinion, in which it reviewed the evidence at length and analyzed various judicial decisions bearing on the subject. Pursuant to its memorandum opinion, the trial court made findings of fact and conclusions of law and subsequently entered an order, in the form of a temporary injunction, denying defendants' motion to dissolve the prior temporary restraining order and decreeing that defendants be enjoined, *pendente lite,* from in any manner picketing the plaintiffs' place of business.

When the action came on later for trial on the merits, the parties stipulated that the cause be submitted to the court for final judgment upon the evidence theretofore introduced on plaintiffs' application for a temporary injunction, and

further stipulated that the plaintiffs had sustained damages in the amount of two hundred fifty dollars, as the result of the picketing of their business establishment between the dates of February 12 and February 24, 1948.

The court thereupon entered a decree which reaffirmed its memorandum opinion and its findings of fact and conclusions of law, and ordered that the defendants be permanently enjoined from picketing the plaintiffs' place of business and that plaintiffs have judgment against the defendants, and each of them, in the sum of two hundred fifty dollars, together with their costs and disbursements in the action. Defendants appealed.

There is little, if any, dispute in the evidence. At the times with which we are here particularly concerned with respect to this litigation, respondents, A. E. Hanke and his three sons, L. J. Hanke, R. R. Hanke, and R. M. Hanke, were operating a copartnership business in the city of Seattle, under the firm name of Atlas Auto Rebuild. The father and two of the sons had purchased the business in June, 1946, at which time it included a station and plant for the repair and rebuilding of automobiles, and also a gas station. Shortly after completing that transaction, respondents added to their venture the business of selling used cars. The third son joined the firm in September, 1947.

The parties from whom the respondents acquired the original business had, during their term of operation, kept on display, in a window of the establishment, a teamsters' union shop card, issued to them by the appellant International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers Union, Local 309, which is affiliated with American Federation of Labor and which will hereinafter be referred to simply as Local 309 or as the local union. This shop card was made up of a metal sign, eleven inches by seven inches in size, bearing the insignia of the brotherhood, and proclaiming that "Union Service" was to be had at that establishment. When respondents purchased the business, they retained the card, allowing it to remain in its accustomed place in the window until shortly before this controversy arose.

The parent union with which Local 309 is affiliated issues weekly in Seattle its official publication, known as the Washington Teamster, in which, under large attractive headings and subheadings, are listed the names of firms which carry teamster shop cards and for whose support patronage is by the publication solicited. In this list the name of Atlas Auto Rebuild was included, up until the last week in January, 1948.

It appears that respondent A. E. Hanke, father of the other three respondents, had formerly been a member of a shipyard union, but, shortly after the purchase of the service and gas station above mentioned, had transferred his union membership to Local 309. So far as the record herein discloses, none of the respondent sons was ever a member of that local union.

During the first few months of their operation of the business, respondents employed, in the rebuild department of the plant, two body men and a sheet metal worker, who, although they were union members, did not belong to Local 309. Late in the fall of 1946, these employees were laid off and have never since been replaced. From that time until the dispute herein arose, in the early part of 1948, respondents have not hired any employees in the operation of any part of their business, but have themselves alone done all the work and labor connected therewith.

Although, as stated above, respondent A. E. Hanke was at one time affiliated with Local 309, he ceased to be a member thereof in January, 1948, by virtue of the fact that his union dues had been in arrears since the preceding September, and further because, on January 27, 1948, he had notified the union that he had no intention of seeking reinstatement. The affidavit of appellant Dick Klinge, business agent for Local 309, establishes the fact that the local union ceased to regard A. E. Hanke as a member after the date last mentioned.

While this action is waged directly between the respondents and Local 309 and its representatives, the actual dispute between them arose out of certain activities and de-

mands stemming from another union, namely, Automobile Drivers and Demonstrators, Local Union No. 882, generally known as the Automobile Salesmen's Union. This particular union, which is also affiliated with American Federation of Labor and is chartered by International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, asserts jurisdiction over salesmen of new and used automobiles. Although the Automobile Salesmen's Union, Local 882, is separate and distinct from Local 309, the two are nevertheless closely related in interest.

It appears that on June 12, 1946, the Automobile Salesmen's Union, Local 882, entered into a working agreement with Independent Automobile Dealers Association, by the terms of which agreement all show rooms and used car lots were to close not later than six o'clock p. m. on all week days and were to remain closed on Saturdays, Sundays, and certain specified holidays. Of the 115 used car dealers covered by this agreement, all but ten operated their business without the aid of any hired employees. The respondents, however, were not members of the dealers' association and did not conduct their business in accordance with that agreement. They kept open after six o'clock p. m. whenever it was considered necessary to do so in order to complete the work in hand, and they also sold used cars on Saturdays, Sundays, and holidays.

At some time prior to January 27, 1948, the appellant Local 309, which was a member of the parent teamsters organization, was notified by Local 882, which was affiliated with the same organization, that Atlas Auto Rebuild, of which the respondents were the sole owners, was selling used cars after six p. m. on week days and also at other times covered by the agreement previously entered into between Local 882 and Independent Automobile Dealers Association. As the result of this communication, representatives of the appellant Local 309 called upon the respondents at their place of business on the date last mentioned. The substance of the conversation that took place at that time, as found by the trial court, is that the representatives

of Local 309 demanded that respondents comply with the terms of the agreement entered into by and between Local 882 and Independent Automobile Dealers Association, or else suffer loss of the union shop card referred to above. Respondents, who were not members of the dealers association and were not represented in that agreement, firmly and emphatically replied that they could not, and would not, confine themselves to the shorter business hours and limited periods demanded by the union, for the reason that it would be impossible for them to continue in business under such restrictions. The union shop card was thereupon tendered to the representatives of the appellant local, who, upon their departure, took it with them. About that same time, the name of Atlas Auto Rebuild was deleted from the list of firms appearing in, and recommended by, the Washington Teamster, the official publication of the parent union organization.

On the morning of February 12, 1948, a single picket appeared in front of respondents' place of business, bearing a sandwich sign, upon which was printed in large letters, in both front and rear, the following legend: "UNION PEOPLE LOOK FOR THE [facsimile of Teamsters' shop card] UNION SHOP CARD." This picket patrolled up and down in front of the respondents' place of business, between the hours of eight-thirty a. m. and five p. m., talking to people who entered the place, and taking down the automobile license numbers of patrons of the respondents. The result of this picketing activity was that respondents' business immediately fell off very heavily; drivers for supply houses refused to deliver parts and other materials to the respondents; and, in order to obtain the materials necessary for the operation of their business, respondents were compelled to call for and transport the materials from the various supply houses in a truck furnished by themselves. Because of the situation thus created, this action was instituted.

It will be borne in mind that, at the time the picketing was started by the appellants, the respondents had no hired help, but themselves did all the work connected with the

operation of their business; that no member of their partnership was a member of either Local 309 or Local 882; that the partnership was not a member of the automobile dealers association; and that respondents had no agreement with any local union or anyone else relative to the manner in which their business was to be conducted.

The controlling question involved in this appeal is whether or not, under the facts of the instant case, the granting of injunctive relief by the trial court against the appellant union and its representatives violates the provision of the Federal constitution forbidding the abridgment of freedom of speech.

The factual situation in the case before us bears a close resemblance to that which obtained in the recent case of *Gazzam v. Building Service Employees International Union, Local 262*, reported in 29 Wn. (2d) 488, 188 P. (2d) 97. In fact, it seems to be agreed between the parties herein that, unless that case be now overruled, it is controlling of the case at bar. We shall therefore turn our attention to a consideration of the *Gazzam* case, *supra*.

The facts therein may be summarized as follows: The plaintiff, W. L. Gazzam, was the owner and operator of Enetai Inn, in Bremerton, comprising a hotel of one hundred rooms and seven adjacent cottages, adapted and used largely for the accommodation of transient guests. In his operation of the inn, plaintiff employed about fifteen persons, consisting of an engineer, a janitor, bell boys, clerks, and a housekeeper. None of the employees belonged to the union defendant in that action, and no dispute existed between the plaintiff and his employees regarding wages, hours, or conditions of employment.

Representatives of the union called on the plaintiff and endeavored to have him enter into a contract which would require all of plaintiff's employees to join the union. Plaintiff stated that his answer to that request would depend upon the action of the people who were in his employ, but at the same time he gave the representatives permission to talk to those employees. Upon a second occasion, the representa-

tives made the same request of the plaintiff, and the latter gave the same answer. Shortly thereafter, the central labor council of Bremerton wrote plaintiff a letter stating that, at the instance of the defendant union, a meeting was called and would be held to consider the matter of placing plaintiff's hotel on the "We do not patronize" list. Plaintiff, although invited to attend the meeting, did not personally appear, but was represented there by his attorney.

Following that meeting, plaintiff, at the request of the union, arranged another meeting to be had between the union representatives and the hotel employees. At that meeting, which also was not attended by the plaintiff, the representatives of the union talked to the employees, explained to them the benefits of union membership, and asked them to join their local. The employees, however, indicated that they did not desire to become members of the union. As a result of that action, the central labor council notified plaintiff that his hotel had been placed on the "We do not patronize" list.

Soon thereafter, the union "peacefully picketed" the plaintiff's place of business. Upon the institution of the picketing program, a laundry concern which had previously taken care of the plaintiff's laundry needs, and whose employees belonged to the defendant union, refused to do the required work for the plaintiff. He then attempted to do his laundry work with the aid of his own employees, but without success. The evidence established that the plaintiff suffered damages as the result of the picketing by the defendant union.

The plaintiff thereupon brought suit to recover damages for the injury thus sustained by him and, further, to secure injunctive relief. The trial court granted the defendant's motion for nonsuit and dismissed the action. The plaintiff appealed and, upon the appeal, contended that the sole purpose of the picketing and the listing as unfair was to compel him to coerce his employees to join the union against their will; he further contended that coercion is contrary to the public policy of this state, as declared in the labor dis-

putes act, chapter 7, p. 10, Laws of 1933, Ex. Ses. (Rem. Rev. Stat. (Sup.), § 7612-2 [P.P.C. § 695-3]). The union, on the other hand, contended that picketing by a union, even though such union does not include in its membership any employees of the party picketed, is nevertheless legal.

In disposing of the appeal in that case, this court recognized that discrepancies had crept into some of our decisions affecting the question there involved, and for that reason the court assayed the task of reviewing the recent cases from this jurisdiction touching the subject of picketing. The list of cases thus analyzed consists of the following: *Safeway Stores v. Retail Clerks' Union, Local No. 148,* 184 Wash. 322, 51 P. (2d) 372; *Blanchard v. Golden Age Brewing Co.,* 188 Wash. 396, 63 P. (2d) 397; *Kimbel v. Lumber & Sawmill Workers Union No. 2575,* 189 Wash. 416, 65 P. (2d) 1066; *Adams v. Building Service Employees International Union, Local No. 6,* 197 Wash. 242, 84 P. (2d) 1021; *Fornili v. Auto Mechanics' Union Local No. 297, etc.,* 200 Wash. 283, 93 P. (2d) 422; *United Union Brewing Co. v. Beck,* 200 Wash. 474, 93 P. (2d) 772; *Yakima v. Gorham,* 200 Wash. 564, 94 P. (2d) 180; *Bloedel Donovan Lbr. Mills v. International Woodworkers of America, Local No. 46,* 4 Wn. (2d) 62, 102 P. (2d) 270; *Shively v. Garage Employees Local Union No. 44,* 6 Wn. (2d) 560, 108 P. (2d) 354; *Edwards v. Teamsters Local Union No. 313,* 8 Wn. (2d) 492, 113 P. (2d) 28; *O'Neil v. Building Service Employees International Union, Local No. 6,* 9 Wn. (2d) 507, 115 P. (2d) 662, 137 A. L. R. 1102; *S & W Fine Foods v. Retail Delivery Drivers and Salesmen's Union, Local No. 353,* 11 Wn. (2d) 262, 118 P. (2d) 962; *Weyerhaeuser Tbr. Co. v. Everett Dist. Council of Lbr. & Sawmill Workers,* 11 Wn. (2d) 503, 119 P. (2d) 643; *State ex rel. Lbr. & Sawmill Workers v. Superior Court,* 24 Wn. (2d) 314, 164 P. (2d) 662, 166 A. L. R. 165; *Swenson v. Seattle Central Labor Council,* 27 Wn. (2d) 193, 177 P. (2d) 873, 170 A. L. R. 1082.

We make specific citation of these cases for the reason that in them will be found full and emphatic expression of the various views entertained by the judges of this court upon this very vexed question.

After analysis and discussion of the cases above cited, this court, in the *Gazzam* case, *supra,* expressly overruled the *O'Neil* and *S & W Fine Foods* cases, *supra,* as being wrong in principle and contrary to the most recent view of a majority of the court.

The substance of our holding in the *Gazzam* case, *supra,* is, as was succinctly stated in the first headnote of the opinion, that peaceful picketing of an employer's place of business is not protected by the constitutional guaranty of free speech and is unlawful, where the employees are not members of the picketing union and the purpose of the picketing is to force the employees to join the union or to compel the employer to enter into a contract which would, in effect, compel his employees to become members of the union.

The facts in the instant case fall squarely within the inhibition of the holding of the *Gazzam case.* The purpose of the picketing in the present instance was (1), indirectly, to compel the respondents to become members of one or the other, or possibly both, of the two unions above mentioned; and (2), directly, to coerce the respondents to enter into an agreement under which they would carry on their business only during those hours and days arbitrarily fixed by the Automobile Salesmen's Union, Local 882.

We now find and here declare that the picketing activity conducted by Local 309, at the instance of Local 882, constituted coercion and was therefore unlawful. This conclusion is the view of the majority of this court as presently constituted, and therefore, without further comment thereon, we decline to overrule the *Gazzam* case, *supra.*

Appellants strenuously contend that our holding in the *Gazzam* case, *supra,* is in direct conflict with certain decisions of the United States supreme court and for that reason the *Gazzam* case should now be overruled. The decisions which appellants cite and on which they rely as supporting their contention are the following: *Senn v. Tile Layers Protective Union, Local No. 5,* 301 U. S. 468, 81 L. Ed. 1229, 57 S. Ct. 857; *Thornhill v. Alabama,* 310 U. S. 88, 84

L. Ed. 1093, 60 S. Ct. 736; *American Federation of Labor v. Swing*, 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568; *Bakery & Pastry Drivers & Helpers Local 802, etc. v. Wohl*, 315 U. S. 769, 86 L. Ed. 1178, 62 S. Ct. 816; *Cafeteria Employees Union, Local 302 v. Angelos*, 320 U. S. 293, 88 L. Ed. 58, 64 S. Ct. 126.

█ Our view of the effect of those decisions does not coincide with that of the appellants.

We do not believe that the United States supreme court has ever held that the right of free speech is an absolute right, to be protected regardless of the deleterious effect so produced in regard to other interests also protected by the Federal constitution; nor do we believe that the United States supreme court has ever said that a state is without power to abridge this right where such a course is necessary to protect property rights and is in the general interests of the community.

In the case of *Shively v. Garage Employees Local Union*, 6 Wn. (2d) 560, 108 P. (2d) 354, we had occasion to consider the question whether the constitutional guaranty of freedom of speech, as interpreted by the United States supreme court, is an absolute right which may be exercised without qualification, or whether, like other rights, it must be exercised with reasonable regard for the conflicting rights of others. Many United States supreme court decisions were there considered and, after mature reflection, we expressed the view that the right of freedom of speech is not absolute. We quote a paragraph from that opinion:

"In the instant case, we are concerned with balancing appellants' [the employers'] right to carry on lawful businesses, free from unreasonable interference, and respondents' [picketing members of a union] right to freedom of speech. Neither of these rights is absolute, in the sense that it may be exercised in utter disregard of the other; both cannot be unqualifiedly exercised at the same time. It is within the power of the court to decide whether appellants should be denied their right to conduct their businesses free from unjustifiable interference by respondents, or whether respondents' right of freedom of speech should be reasonably limited."

One of the most recent pronouncements of the United States supreme court concerning the scope and limitations of the constitutional protection afforded the right of free speech is contained in the case of *Kovacs v. Cooper,* 336 U. S. 77, 93 L. Ed. 379, 69 S. Ct. 448. The issue there involved was whether or not an ordinance of the city of Trenton, New Jersey, which forbade the use of sound-amplifying equipment emitting "loud and raucous noises" on the streets of Trenton was valid. The majority of the court, speaking through Mr. Justice Reed, held that the ordinance was constitutional, against the claim that it deprived the appellant therein of his right of freedom of speech as guaranteed by the fourteenth amendment, saying:

"A state or city may prohibit acts or things reasonably thought to bring evil or harm to its people,"

and, further:

"Of course, even the fundamental rights of the Bill of Rights are not absolute. . . . To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself."

The theory upon which appellants' contention herein rests, although it has not been so expressed in their brief, must necessarily proceed upon some such formula as the following: The right of free speech is protected by the constitution; the supreme court of the United States has held that peaceful picketing is an exercise of the right of free speech; the picketing here involved was peaceful; therefore, it follows that the picketing in this instance is protected by the constitutional provisions.

The concurring opinion of Mr. Justice Frankfurter in *Kovacs v. Cooper, supra,* illustrates the error of applying any such mechanical formula in the interpretation of the United States constitution. We quote his language:

"Some of the arguments made in this case strikingly illustrate how easy it is to fall into the ways of mechanical jurisprudence through the use of oversimplified formulas. It is argued that the Constitution protects freedom of speech: freedom of speech means the right to communicate, whatever the physical means for so doing; sound trucks are one form of communication; *ergo* that form is entitled to the

same protection as any other means of communication, whether by tongue or pen. Such sterile argumentation treats society as though it consisted of bloodless categories."

In further emphasis of this point, Mr. Justice Frankfurter quotes the following statement made by Mr. Justice Holmes in his Collected Legal Papers: "To rest upon a formula is a slumber that, prolonged, means death."

The case most strongly relied upon by the appellants to sustain their argument is *Bakery & Pastry Drivers & Helpers Local 802, etc. v. Wohl, supra,* wherein the supreme court of the United States denied the right of the state of New York to prohibit peaceful picketing, in a dispute involving the question of whether or not the appellant union therein had the right to picket for the purpose of forcing an independent bakery goods peddler, employing no one, to cease working more than six days a week, or else to employ a union relief driver to work the seventh day.

Upon such a skeleton statement of the facts, that case appears to be exactly in point on the issue before us in the present case. However, a closer scrutiny of the facts of the *Wohl* case, *supra,* and of the language of the holding of the court, reveals that the two cases are clearly and readily distinguishable. The facts leading to the dispute in the *Wohl* case can best be set forth by quoting directly from the opinion:

"Five years before the trial, there were in New York City comparatively few peddlers or so-called independent jobbers—fifty at most, consisting largely of men who had a long-established retail trade. About four years before the trial, the social security and unemployment compensation laws, both of which imposed taxes on payrolls, became effective in the State of New York. Thereafter, the number of peddlers of bakery products increased from year to year, until at the time of hearing they numbered more than five hundred. In the eighteen months preceding the hearings, baking companies which operated routes through employed drivers had notified the union that, at the expiration of their contracts, they would no longer employ drivers, but would permit the drivers to purchase trucks for nominal amounts, in some instances fifty dollars, and thereupon to continue to distribute their baked goods as peddlers. Within such

period, a hundred and fifty drivers, who were members of the union and had previously worked under union contracts and conditions, were discharged and required to leave the industry unless they undertook to act as peddlers.

"The peddler system has serious disadvantages to the peddler himself. The court has found that he is not covered by workmen's compensation insurance, unemployment insurance, or by the social security system of the State and Nation. His truck is usually uninsured against public liability and property damage, and hence commonly carried in the name of his wife or other nominee. If injured while working, he usually becomes a public charge, and his family must be supported by charity or public relief."

Continuing, the court pointed out that

"The union became alarmed at the aggressive inroads of this kind of competition upon the employment and living standards of its members. The trial court found that if employers with union contracts are forced to adopt the 'peddler' system, 'the wages, hours, working conditions, six-day week, etc., attained by the union after long years of struggle will be destroyed and lost.' "

The picketing in the *Wohl* case consisted of one or two members of the union walking for short periods of time in the vicinity of two of the bakeries which sold products to Wohl and Platzman, each of the pickets carrying a placard which bore the name of either Wohl or Platzman, underneath which was the following statement:

" 'A bakery route driver works seven days a week. We ask employment for a union relief man for one day. Help us spread employment and maintain a union wage hour and condition. Bakery & Pastry Drivers & Helpers Local 802, I. B. of T. Affiliated with A. F. L.' "

The facts of the case at bar present no such appealing picture in favor of the appellants. Local 882, on whose behalf appellant Local 309 set up the picket line in front of the respondents' place of business, represents the used-car salesmen in the Seattle area. Of 115 such concerns, only ten employ any help at all, the remainder being operated exclusively by their proprietors. From this fact, the conclusion seems irresistible that the union's interest in the welfare of a mere handful of members (of whose working conditions

no complaint at all is made) is far outweighed by the interests of individual proprietors and the people of the community as a whole, to the end that little businessmen and property owners shall be free from dictation as to business policy by an outside group having but a relatively small and indirect interest in such policy.

In the case of *Carpenters & Joiners Union of America, Local No. 213 v. Ritter's Cafe,* 315 U. S. 722, 86 L. Ed. 1143, 62 S. Ct. 807, the United States supreme court stated the rule to be applied in this type of case as follows:

"Whenever state action is challenged as a denial of 'liberty,' *the question always is whether the state has violated 'the essential attributes of that liberty.'* Mr. Chief Justice Hughes in *Near v. Minnesota,* 283 U. S. 697, 708 [75 L. Ed. 1357, 51 S. Ct. 625, 628]. While the right of free speech is embodied in the liberty safeguarded by the Due Process Clause, that Clause postulates the authority of the states to translate into law local policies 'to promote the health, safety, morals and general welfare of its people. . . . The limits of this sovereign power must always be determined with appropriate regard to the particular subject of its exercise.' *Ibid.,* at 707 [75 L. Ed. 1357, 51 S. Ct. at page 628]. *'The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or farther side.'* Hudson Water Co. v. McCarter, 209 U. S. 349, 355 [52 L. Ed. 828, 28 S. Ct. 529, 531, 14 Ann. Cas. 560]." (Italics ours.)

In our opinion, there is small reason for holding that the appellant union, acting under the guise of protecting the union's freedom of speech, cannot be restrained from depriving the respondents of the liberty .of lawfully conducting their business in the only manner that it could be profitably conducted.

We are clearly of the opinion that the decree of the trial court in the instant case is not contrary to the provisions of the constitution of the United States.

The judgment is affirmed.

JEFFERS, C. J., SIMPSON, and HILL, JJ., concur.

SCHWELLENBACH, J., concurs in the result.

MALLERY and BEALS, JJ., dissent.

ROBINSON, J. (dissenting)—In *American Federation* of *Labor v. Swing,* 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568, Mr. Justice Frankfurter stated the question there involved to be as follows:

"More thorough study of the record and full argument have reduced the issue to this: is the constitutional guarantee of freedom of discussion infringed by the common law policy of a state forbidding resort to peaceful persuasion through picketing merely because there is no immediate employer-employee dispute?"

The answer there reached is "Yes." It appears to me that the answer reached in *Gazzam v. Building Service Employees Internation Union, Local 262,* 29 Wn. (2d) 488, 188 P. (2d) 97, and reiterated in the instant decision, is "No." Thus, the *Swing* case reads:

"The scope of the Fourteenth Amendment is not confined by the notion of a particular state regarding the wise limits of an injunction in an industrial dispute, whether those limits be defined by statute or by the judicial organ of the state. A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. *American Steel Foundries v. Tri-City Council,* 257 U. S. 184, 209. The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ."

On the other hand, the majority in the instant case say:

"The substance of our holding in the *Gazzam* case, *supra,* is, as was succinctly stated in the first headnote of the opinion, that peaceful picketing of an employer's place of business is not protected by the constitutional guaranty of free speech and is unlawful, where the employees are not members of the picketing union and the purpose of the picketing is to force the employees to join the union or to compel the employer to enter into a contract which would, in effect, compel his employees to become members of the union. . . . we decline to overrule the *Gazzam* case, *supra.*"

I am unable to reconcile the two views. To further illustrate the discrepancy which I feel exists here between our holdings and those of the United States supreme court, I refer to the case of *Cafeteria Employees Union, Local 302 v. Angelos,* 320 U. S. 293, 88 L. Ed. 58, 64 S. Ct. 126, which cites and relies on the *Swing* case. In that case, the owners of a certain restaurant conducted their business themselves without the aid of any employees. Union members picketed it. The picketing was peaceful, and was held to be permissible as an exercise of free speech, although, as the court found, the purpose of the picketing was to "organize" the restaurant. How does picketing, under these circumstances, differ from that declared to be "unlawful" in the above quotation?

The end sought to be attained by peaceful picketing is not merely the dissemination of information concerning the union's grievance against the employer picketed, since, obviously, that in itself can be of no benefit to the union. Rather, by the dissemination of such information in this manner, the union hopes to persuade others not to deal with the employer. If these others respond, the employer's business suffers, and he may consequently accede to the union's demands. In effect, of course, this amounts to "coercion" of the employer; but if that term is to be employed, it should be used with caution, since it is quite clear that this is not the type of "coercion" which the United States supreme court has declared will take picketing from the protection of the fourteenth amendment. On the contrary, this sort of "coercion" was held to be entirely lawful in the *Swing* and *Angelos* cases, *supra,* and in *Bakery & Pastry Drivers & Helpers Local 802 v. Wohl,* 315 U. S. 769, 86 L. Ed. 1178, 62 S. Ct. 816. What the supreme court means by "unlawful coercion" is clearly illustrated by *Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies,* 312 U. S. 287, 85 L. Ed. 836, 61 S. Ct. 552, 132 A. L. R. 1200, decided the same day as the *Swing* case. In that case, in the course of holding that picketing, enmeshed with violence, could be enjoined, the court said:

"No one will doubt that Illinois can protect its storekeepers from being coerced by fear of window-smashings or burnings or bombings. And acts which in isolation are peaceful may be part of a coercive thrust when entangled with acts of violence. The picketing in this case was set in a background of violence. In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future picketing might be wholly peaceful."

The only circumstance I can find in this case which might conceivably constitute "coercion," in the sense in which the supreme court has used that term, is the taking down of automobile license numbers of the patrons of the respondents. Of course, no one would contend that such activities as this are protected by the constitutional guarantee of freedom of speech; but neither can it be said that they are so "enmeshed" with the picketing that harm would be done in enjoining them separately, permitting the constitutionally valid picketing to continue.

*Carpenters & Joiners Union of America, Local No. 213 v. Ritter's Cafe*, 315 U. S. 722, 86 L. Ed. 1143, 62 S. Ct. 807, rather plainly indicated that the identification of peaceful picketing with freedom of speech may not always be complete, in that situations may arise wherein limitations will be placed on the former which find no analogy in the limitations which may be placed on the latter. Thus, in that case, union carpenters and painters picketed a certain restaurant, although they had no grievance against its owner other than that he had contracted for the construction of a building, not connected with the restaurant business and a mile and a half away, with a contractor who employed non-union labor. This picketing was enjoined by the lower court as a violation of a state antitrust law. The supreme court held that the law, as so construed, did not violate the fourteenth amendment. It stated that:

"As a means of communicating the facts of a labor dispute, peaceful picketing may be a phase of the constitutional right of free utterance. But recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power to confine the sphere of communica-

tion to that directly related to the dispute. Restriction of picketing to the area of the industry within which a labor dispute arises leaves open to the disputants other traditional modes of communication."

It is true that this decision seems inconsistent with the supreme court's broad general theory that picketing is equivalent to free speech; nevertheless, in merely holding that the restaurant owner could not be picketed because he was outside the area of industrial dispute, it does not seem to me that the court established a precedent of any value in a case such as that at bar. The facts in the *Ritter's Cafe* case bore no resemblance to those in the instant case; the court expressly distinguished the *Swing* case; and, when the *Angelos* case was decided two years later, the court indicated that it was not disposed to recede from its original opinion that a state could not constitutionally forbid peaceful picketing of an employer merely because he employed no members of the picketing union.

My personal views concerning the desirability of identifying picketing with freedom of speech were set forth in concurring opinions in *O'Neil v. Building Service Employees International Union, Local No. 6,* 9 Wn. (2d) 507, 115 P. (2d) 662, 137 A. L. R. 1102, and in *S & W Fine Foods v. Retail Delivery Drivers & Salesmen's Union, Local No. 353,* 11 Wn. (2d) 262, 118 P. (2d) 962. They have not changed. But neither has my belief that, in the interpretation of the Federal constitution, the supreme court of the United States must have the final word.

I, therefore, dissent.

GRADY, J. (concurring)—As a general rule, neither a concurring opinion nor a dissent serves much useful purpose or is of much assistance in the solution of the particular judicial problem before the court, but as I have not had an opportunity to express any views on the complex questions which have heretofore come before this court arising out of the clash between conflicting constitutional rights and privileges possessed by organized labor and those engaged in commercial enterprises, or as between labor organizations themselves, I find myself in a dilemma as I read the

majority and dissenting opinions of my associates in this case as well as the cases, both state and Federal, which have been cited.

When the United States supreme court handed down its opinion in *American Federation of Labor v. Swing*, 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568, there arose the belief in the minds of many persons that, as the physical act of picketing was a manifestation of speech, the freedom of which was guaranteed by the United States constitution, that this meant it could be exercised regardless of its economic effect on others and thereby labor organizations might by this method lawfully exert sufficient economic pressure to force acquiescence in the attainment of their objectives. This idea overlooked the fact that those upon whom the economic pressure was exerted likewise had equally guaranteed constitutional rights and privileges. In the inevitable clash that followed when each claimant insisted upon the full measure of such constitutional rights, both the legislative and judicial branches of government have had to take a firm stand and by legislation in some states and by judicial decree in others make an attempt to prescribe limitations upon and regulate the exercise of the right of free speech in the form of picketing. This has been an ever-increasing and difficult task. The net result to date is the promulgation of certain principles and pronouncements to be applied to each situation as it arises, all with the view of conveying to the contending forces some of the limitations upon the exercise of their respective rights.

With this objective in view, a majority of the members of this court in the present case and in some of those cited have endeavored to balance conflicting interests both as between the directly interested parties and the public welfare, and in doing so have stated in effect that, whenever picketing is carried beyond the field of persuasion into the field of intimidation, coercion, or business compulsion, it ceases to be protected as free speech. This conclusion has been reached after much study and reflection, as indicated by our many decided cases; and while there may be room for a difference of opinion as to whether the degree of coercion

exists in this case as to warrant the conclusion reached by the majority, I am constrained to concur in the majority opinion because it follows and applies rules to which the court has definitely committed itself by such cases as *Swenson v. Seattle Central Labor Council,* 27 Wn. (2d) 193; 177 P. (2d) 873, 170 A. L. R. 1082, and *Gazzam v. Building Service Employees International Union, Local 262,* reported in 29 Wn. (2d) 488, 188 P. (2d) 97. The trend of legislation in many states, and of recent decisions of the courts of such states and those of the United States supreme court sustaining the enactments, is in this same direction.